## HAMILTON v. ARMSTRONG *et al., Appellants.*

### In Banc, March 5, 1894.

120  597.
123  196
120  597
133   95
66a  226
120  597
135  410
135  503
137   39
137  185
120  597
141  662
142   83
144    8
144  639
120  597.
157  421
85a  408

1. **Practice:** FINDINGS OF LAW AND FACT. Findings of law and fact filed after the judgment do not constitute a part of the record and will not be reviewed on appeal.

2. **Presumption:** DEEDS OF GIFT. The mere fact that the grantees in deeds of gift, and who were nieces of the grantor, nursed him and cared for him during his last illness will create no presumption against the validity of the deeds.

3. **Deed of Gift:** UNDUE INFLUENCE: CASE ADJUDGED. Deceased, sixty years of age, intelligent, keeping house with his sister and her widowed daughter, being in his last illness but with mind unimpaired and nursed by said widow and her married sister, directed the husband of the latter to draw deeds for his whole property in favor of said two nieces. The husband prepared the deeds and brought a notary who read them to deceased before execution and took his acknowledgment. The deeds were then delivered to the draftsman who placed them in a bureau drawer in the house of the deceased and subsequently, before the death of the latter, had them recorded. The only other relatives of the deceased were his married brother with whom he had had differences but which had been settled and his sister's son who had annoyed deceased with his arguments on religion. Deceased had declined in his illness to see the latter because he "would talk too much." His brother was notified of the illness and was admitted when he called to see deceased. There was evidence of previous declarations by deceased of his intention to so dispose of his property, but none that either of the nieces, or any one for them, procured the execution of the deeds. Deceased died on the fourth day after the execution of the deeds. *Held,* reversing the decree of the trial court, that the deeds were valid and should stand.

4. ———: DELIVERY. Where deeds of gift are prepared on the express direction of the grantor, read over to him by the notary, signed and acknowledged by him, and by his order and in his presence are given to the husband of one of the grantees and thereafter the grantor indicates no wish to retract them, the delivery is sufficient.

*Appeal from Buchanan Circuit Court.*—HON. O. M. SPENCER, Judge.

REVERSED AND REMANDED.

*M. A. Reed* and *B. R. Vineyard* for appellants.

(1) While actual fraud was claimed in the petition, none was proved. The findings of the court below upon this point should be satisfactory. (2) The grantees in the deeds were nieces of the grantor, and no relation is shown but that growing out of this kindred relation. Undue influence is never presumed from a relationship which the law sanctions and approves. *Coit v. Patchen*, 77 N. Y. 539; *Aid Society v. Loveridge*, 70 N. Y. 387; *Carty v. Connolly*, 27 P. R. 600; *McCaul v. McCaul*, 10 Sup. Ct. R. 707; Schouler on Wills, secs. 229, 230. Dominion, in the sense of producing undue influence, will not be inferred or imputed from these natural relations. *Jackson v. Hardin*, 83 Mo. 184; *Rankin v. Rankin*, 61 Mo. 300; *Thompson v. Ish*, 99 Mo. 182; *Myers v. Hauger*, 98 Mo. 438; *Rule v. Maupin*, 84 Mo. 591; *In re Gleespin's Will*, 26 N. J. Eq. 523; *Coit v. Patchen*, 77 N. Y. 539. (3) Our own supreme court, as well as the courts of other states, has decided that irregular agencies and slight services naturally referable to family affection, do not establish the relation from which undue influence is to be presumed. *Hollocher v. Hollocher*, 62 Mo. 267; 83 Mo. 185, *supra;* Schouler on Wills, sec. 230; *Samson v. Samson*, 25 N. W. Rep. 236; *Bleecker v. Lynch*, 1 Bradf. 458; *Elliott's Will*, 2 J. J. Marsh. 340; 84 Mo. 591, *supra*. (4) But it has been decided that "no commentator on the principles of equity, and no reported case goes to the extent of saying that by force of the relation of principal and agent, a deed is *ipso facto* void. In all cases of gift between such parties, the *onus* is on party assailing it." *Uhlich v. Muhlke*, 61 Ill. 510; *Lee v. Lee*, 71 N. C. 139; Kerr on Fraud, 103, 104, 125; *Hunter v. Adkins*, 3 Mylne &

K. 134; *Howe v. Howe,* 99 Mass. 88.   Certain relations imply dominion, such as guardian and ward, trustee and beneficiary, attorney and client; but the relation of principal and agent or confidential advisor, is one of trust and not of dominion, and abuse of that trust must be shown, not· presumed.   25 N. W. Rep. 230–239, subdivision 6, and classifications thereof. (5) The passive instrumentality of Mr. McLean in supervising the preparation of the deeds, is of no moment.   He moulded   nothing— he   was himself moulded.   It is thus shown that his instrumentality changed nothing.   Under such circumstances, it matters not who drew the deeds.   *Uhlich v. Muhlke,* 61 Ill. 522; 70 N. Y. 403; Schouler on Wills, sec. 245; *Rusling v. Rusling,* 36 N. J. Eq. 610; *Kirwin v. ·Cullen,* 4 Irish Ch. (N. S.) 326; *Ford v. Hennesy,* 70 Mo. 588; *Leder v. Whelpley,* 111 N. Y. 249; *Carter v. Dixon,* 69 Ga. 82; 4 Redf. (N. Y.) 441; *Samson v. Samson,* 25 N. W. Rep. 236; *Stout v. Smith,* 98 N. Y. 29.   (6) But it is further said that because Mrs. Bates, a member of his own household, and Mrs. McLean, the grantees in the deed, waited upon the sick man's wants for a little over a week, that thereby the relation of nurse was established, implying dominion, and that for this reason, undue influence should be presumed. The law induges no such heartless presumption. *Bundy v. McKnight,* 48 Ind. 503; 67 Mo. 196; *In re Mondorf's Will,* 110 N. Y. 450; *Crowe v. Peters,* 63 Mo. 429; *In re Dunham's Will,* 1 N. Y. S. 120; 121 N. Y. 575; *Matter of Will,* 98 N. Y. 193; *Callery v. Miller,* 1 N. Y. S. 88; *Horn v. Pullman,* 72 N. Y. 277; *In re Will,* 5 N. Y. S. 842; *Hollocher v. Hollocher,* 62 Mo. 267. (7) If, however, this court should believe, owing to any of these several relations considered in point two, that the presumption of undue influence arises, then we say the evidence in· the case effectually

rebuts this presumption. (8) The passive relation of kindred blood alone, will never amount to undue influence. Undue influence must be assertion in some form or phase of action, either in open aggressive operations, or in the deceptive workings of plans and schemes. The evidence in this case does not bring it within any definition of undue influence. *Stockton v. Thorn*, 39 N. W. Rep. 143; *Society v. Loveridge*, 70 N. Y. 387; *Conley v. Nailor*, 6 S. C. Rep. 1005. (9) If one has love and affection for another growing out of kindred relation, such party may urge and receive a gift of property, and the law will not say it was obtained by undue influence. Schouler on Wills, secs. 229, 230; *Gleespin's Will*, 26 N. J. Eq. 523; *Eddy's case*, 32 N. J. Eq. 701; *Tawney v. Long*, 76 Pa. St. 106; *Thompson v. Ish*, 99 Mo. 182; *Jackson v. Hardin*, 83 Mo. 184; *Myers v. Hauger*, 98 Mo. 439. This shows how much further the grantees in the deed might have gone than they did, and still have been within the protection of the law. (10) That the deeds were the product of good faith, is conclusively shown by the fact that they corresponded, when made, with John L. Hamilton's long-formed purposes. They accomplished the object he had for years intended as to his property. Schouler on Wills, sec. 247; *Davis v. Rogers*, 1 Houst. 44; *Meyers v. Meredith*, 24 Ga. 325. (11) If John L. Hamilton had mind and memory enough to comprehend and understand the value of the property, and the condition and situation of those who had claims on his bounty, he had the right to make the deeds. *Moore v. Moore*, 67 Mo. 198; *McKinney v. Hansley*, 74 Mo. 326; *Keithley v. Keithley*, 85 Mo. 223. (12) The legal attitude of plaintiff in both the petition and the reply is that the deed had been procured by fraud and undue influence. The attack upon the deed is upon the sole ground that is was obtained in this way.

This by fair implication was an admission that it had been delivered. *Carty v. Connolly*, 27 Pac. Rep. 600. But as a matter of law, the intent to convey and to vest the title in the grantees named in the deed, is evidenced by the act of making out and duly executing and acknowledging the deed. *Burke v. Adams*, 80 Mo. 511. Whether there has been a delivery depends upon the intent of the grantor. *Lee v. Fletcher*, 48 N. W. Rep. 456. If the grantees have the instruments in possession, it is *prima facie* evidence of delivery. *Rogers v. Cary*, 47 Mo. 234; *Games v. Stiles*, 14 Pet. 322; *Ward v. Lewis*, 4 Pick. 520; *Green v. Yarnell*, 6 Mo. 328, 329. But as matter of fact a delivery was actually proved.

*Strong & Mosman* and *Hall & Pike* for respondent.

(1) The special findings of fact and conclusions of law made by the court, were neither excepted to nor mentioned in the motion for a new trial, and are, therefore, conclusive upon the appellants and not open to review here. In this court the facts are as found by the trial court and the law is as concluded by that court. R. S., section 2135; Laws of Mo., 1848–9, p. 90. *Sutter v. Streit*, 21 Mo. 157; *Smith v. Harris*, 43 Mo. 557; *Mining Co. v. Baker*, 139 U. S. 222; *State v. Grimes*, 101 Mo. 188; *State v. Elkins*, 101 Mo. 344; *Parsons v. Randolph*, 21 Mo. App. 353; *Sweet v. Maupin*, 65 Mo. 65; *Bates v. Brown*, 17 Mo. 550; *Fanar v. Lyon*, 19 Mo. 123; *Gobin v Hudgens*, 15 Mo. 400. (2) The cause of action litigated was the fraud and undue influence exercised by the donees and Finis McLean upon John L. Hamilton, the donor. Plaintiff, as the heir of said donor, stands in his shoes, with all the rights of said donor to set aside the deeds obtained by means of said fraud and undue influence. *Gresly v. Mousley*, 4

DeG. & J. 78; *Longmate v. Ledger*, 2 Griff. 157; *Bell-amy v. Sabine*, 2 Phillips, 425; 3 Waits Act. and Def., 478; *Breckenridge v. Ormsby*, 1 J. J. Marsh. 254; *Cotes v. Woodson*, 2 Dana, 452; *Prevost v. Graves*, 5 J. J. Marsh. 114; *Harding v. Handy*, 11 Wheat. 103; *Allore v. Jewell*, 94 U. S., 506; *Fishbourne v. Ferguson*, 84 Va. 87; *Jones v. McGruder*, 12 S. E. Rep. 792; *Davis v. Dean*, 26 N.W.Rep.737. (3) The deeds can not be upheld as a testamentary disposition. *McKinnon v. McKinnon*, 46 Fed. Rep. 723; *Hazelton v. Reed*, 46 Kan. 73; 19 Cent. Law Jour., 46, and cases cited. They must have been delivered to take effect in the lifetime of the grantor, or else they were void. *Tyler v. Hall*, 106 Mo. 313; *Hoey v. Hoey*, 65 Mo. 689; *Standiford v. Standiford*, 97 Mo. 231. (4) They can only be sustained as gifts *inter vivos*. There is a broad distinction between such gifts and testamentary gifts. 2 Pom. Eq. Jur., sec. 960 and note; sec. 961 and note 3. *Parfett v. Lawless*, L. R., 2 Prob. and Div. 462; *Bancroft v. Otis*, 91 Ala. 279. The rule applicable to the gifts *inter vivos* must govern this case. (5) That rule is: The law imposes upon every person occupying a relation of confidence to another, who receives a gift from the latter, the burden of showing beyond a reasonable doubt the absolute fairness of the transaction, before it will permit the donee to retain the gift. 2 Pom. Eq. Jur. secs. 95, 956 and 963; Bigelow on Frauds, 263; note 3, 266, 268, 269; note 3, 54; note 362, 363, 365; note 270; Kerr on Fraud [1 Am. Ed.], 364; *Hall v. Knappenberger*, 97 Mo. 509; *Gay v. Gillilan*, 92 Mo. 262; *Casparis' case*, 12 Mo. App. 313; approved 82 Mo. 649; *Ford v. Hennessy*, 70 Mo. 580; *Bradshaw v. Yates*, 67 Mo. 221; *Rankin v. Patton*, 65 Mo. 378; *Cadwallader v. West*, 48 Mo. 502; *Lawin v. Williams*, 44 Mo. 465. (6) The donees were the donor's exclusive nurses, upon whose constant attention he was as dependent for everything

as an infant in arms. While so dependent they secretly procure a conveyance of all his estate. This alone imposed upon them the burden to show by clear and distinct proof that the donor acted in the transaction free, independent and uninfluenced by them. Authorities *supra,* point 5; *Garvin v. Williams,* 50 Mo. 208; *Parker v. Parker,* 5 Atl. Rep. 586, affirmed 16 Atl. Rep. 537; *Garvin v. Williams,* 44 Mo. 477; *Breed v. Pratt,* 18 Pick. 115; *Greenfield Estate,* 2 Harris, 614; *Cadwallader v. West,* 48 Mo. 484-499; *Forshaw v. Welsby,* 30 Beavan, 243; *Mountford v. Keene,* 19 W. Rep. 708; *Toker v. Toker,* 31 Beavan, 629; *Coutts v. Ackworth,* L. R., 8 Eq. 548; *Wallaston v. Tribe,* L. R., 9 Eq. 49; *Coop v. Lamotte,* 15 Beav. 234; *Rhodes v. Ball,* L. R. 1 Ch. App. 252. *First.* The defendants themselves show that the deeds were to have effect as a will, and not as deeds. Putting transaction in form of deeds instead of a will is a badge of fraud. *Second.* The transaction was kept secret. *Jones v. McGruder,* 12 S. E. Rep. 792. *Third.* There were no previous directions for preparation of the conveyances. No explanation at execution and no recognition by grantor. *Kelly v. Seltegart,* 2 S. W. Rep. 873; *Corigan v. Pironi,* 23 Atl. Rep. 356. *Fourth.* They have not produced a witness to a material fact, who is disinterested or free from their influence. The testimony of the interested parties has been held insufficient. *Street v. Goss,* 62 Mo. 226; *Walker v. Smith,* 29 Beav. 400. *Fifth.* Conduct of defendants before and after the transaction in question shows a purpose to influence Hamilton to make a disposition of his estate to his nieces, and a disposition to use any means to effect that purpose. *Parr v. Saunders,* 11 S. E. Rep. (Va.), 979. *Sixth.* The unusual precaution on the part of the notary at the alleged execution. (7) The cause of action on trial was one to which John L. Hamilton was one of the original parties, and he was

dead. The donees, therefore, were incompetent to testify. R. S., sec. 8918. *Chapman v. Dougherty*, 87 Mo. 617; *Meier v. Thieman*, 90 Mo. 443; *Berry v. Hartzell*, 91 Mo. 136; *Martin v. Jones*, 59 Mo. 186; *O'Bryan v. Allen*, 18 S. W. Rep. 892. (8) Finis McLean was incompetent to testify because he was a real party in interest to the suit, and his right of defense—by virtue of his curtesy estate—was derived to him from his wife who was subject to the disqualification of the estate. R. S. sec. 8918; *Bitner v. Boone*, 18 Atl. Rep. 404; *Southerland v. Ross*, 21 Atl. Rep. 354.

*Lee, McKeighan, Ellis & Priest* also for respondent.

(1) This court should greatly defer to the findings of the trial court. *Snell v. Harrison*, 83 Mo. 652; *Taylor v. Cayce*, 97 Mo. 241; *Judy v. Farmers' Bank*, 81 Mo. 404. (2) The findings of fact and conclusions of law made by the trial court, not being excepted to by the appellants, can not here be questioned. *Crisfield v. Neal*, 13 Pac. Rep. 272. *In re Hood*, 10 N. E. Rep; *Moore v. Campbell*, 13 Pac. Rep. 689; *Sheppard v. Jones* 18 Pac. Rep. 711; *Campbell v. Hayes*, 18 Pac. Rep. 860; *Ash v. Scott*, 39 N. W. Rep. 924; *Chappell v. Snell*, 20 N. E. Rep. 417; *Berkey v. Haskell*, 24 N. E. Rep. 336; *Reddy v. Shamokin*, 20 Atl. Rep. 424; *Watterson v. Kirkwood*, 17 Kan. 9; *Smythe v. Parson*, 14 Pac. Rep. 444; *Glass v. Wilds*, 14 S. W. Rep. 325; *Williams v. Schembi*, 46 N. W. Rep. 403. (3) The appeal can not stand. Elliott's Appellate Procedure, sections 147 and 773, and cases cited in notes. (4) There is a vast difference between the terms "fraud and undue influence" when used in connection with contests concerning wills and when used in respect to contests concerning gifts *inter vivos*. *Parfitt v. Lawless*, L. R. 2, P. & D. 462; Thornton on Gifts and Advancements, sec. 440; *Bancroft v. Otes*, 8 S. Rep. 286-288; *Lee v. Lee*, 71 N. C.

145; *Haydock v. Haydock*, 34 N. J. Eq. 570. (5) The
court will presume the deeds invalid from circumstances.
of confidential relationship, and the facts in this case
establish such relation. *Hunter v. Adkins*, 3 My. & K.
113; *Garvin v. Williams*, 44 Mo. 467–469; *Cadwallader*
*v. West*, 48 Mo. 483; *Yosti v. Laughran*, 49 Mo. 594;
*Gillespie v. Holland*, 40 Ark. 31; *Dent v. Bennett*, 4 My.
& C. R. 277; *Haydock v. Haydock*, 34 N. J. Eq. 570–
574; *Hyburger v. Stiffler*, 21 Md. 338; *Rockfeller v.*
*Newcomb*, 57 Ill. 186; *Ashton v. Thompson*, 32 Minn.
25; s. c., 18 N. W. Rep. 918; *Ilgenfritz v. Ilgenfritz*,
22 S. W. Rep. 786; 2 White & Tudor's Leading Cases.
in Equity, pt. 2, p. 1175; *Bayless v. Williams*, 6 Cald.
(Tenn.) 440; *Long v. Mulford*, 17 Ohio St. 484–505.
(6) Presumption of undue influence not only arises.
from. confidential relations, but also from the fact that
the donor has disposed by the transaction of his entire
property without an equivalent. *Hall v. Knappenber-*
*ger*, 97 Mo. 509; Thornton on Gifts & Advancements,
sec. 447. (7) A presumption of invalidity of the deeds
also arises from the fact that McLean drew them.
Thornton on Gifts & Advancements, sec. 448, and
authorities cited; *Hunter v. Adkins*, 3 My. & K. 113.
(8) The law presumes the deeds invalid because they
were in the nature of a settlement and contained no
power of revocation. Thornton on Gifts & Advance-
ments, sec. 451; *Hall v. Hall*, Law Rep., 14 Eq. 365;
2 White & Tudor's Leading Cases in Equity, pt. 2, p.
1250. (9) The law presumes the deeds invalid because
they are a manifest attempt at a testamentary disposi-
tion of the property. Thornton on Gifts & Advance-
ments, sec. 449; *Haydock v. Haydock*, 34 N. J. Eq.
570; *Wheeler v. Glasgow*, 11 S. Rep. 758. (10) The
deed is void because there was no delivery. *Huey v.*
*Huey*, 65 Mo. 689; *Allen v. DeGroodt*, 105 Mo. 442;
*Pitts v. Sheriff*, 108 Mo. 110; *Hall v. Hall*, 107 Mo. 101.

GANTT, J.—This is a suit for the partition of certain real estate, which prior to his death John Hamilton owned in the city of St. Joseph as a tenant in common with Edward W. Hamilton, his brother, the plaintiff herein. The petition charges that the defendant, Eliza Armstrong, a sister, and the plaintiff, Edward Hamilton, are the sole heirs at law of John L. Hamilton, deceased; that plaintiff is seized of the undivided three-fourths of the lands in controversy, and Mrs. Armstrong, of an undivided one-fourth therein. It then makes this averment:

"And plaintiff further states that the said defendant Susan Jane McLean and Finis R. McLean are husband and wife; that the said Susan J. McLean and Isabell Bates pretend to have some claim or interest in the partition of said above described premises, which in his lifetime belonged to the said John L. Hamilton, and claim to be in possession of certain conveyances alleged to have been executed by the said John, and which the plaintiff alleges were not the acts and deeds of said John L. Hamilton, and were and are null and void. Wherefore the plaintiff prays the order and decree of this court requiring the said defendants McLean and Bates to surrender, cancel and deliver up, as this court shall direct and appoint, the alleged deeds or conveyances so claimed by them from said John L. Hamilton; that the plaintiff and the defendant Eliza be declared to be tenants in common and seized in fee of said premises in the proportion above set forth; and that partition thereof be made between them, and that an undivided three-fourths of said premises be allotted and conveyed to the plaintiff, and an undivided one-fourth thereof allotted and conveyed to the defendant Eliza, and that commissioners be appointed to divide and allot said premises in shares above stated, so that

the plaintiff may severally hold and enjoy his allotment of said premises, and for all proper relief."

To this petition the defendants filed a joint answer, in which they admitted that during the lifetime of John L. Hamilton, the plaintiff Edward and said John Hamilton were the owners of and tenants in common in equal shares of the real estate sought to be partitioned. They admit that plaintiff and Mrs. Eliza Armstrong, one of defendants, are the sole heirs at law of said John L. Hamilton, who died on the second day of August, 1889, leaving no wife, and no children or other descendants or father or mother. They admit that Susan J. McLean and Finis McLean, defendants, are husband and wife, and that Mrs. McLean and Mrs. Bates claim to own and are in possession of that portion of the real estate in suit, formerly owned by John L. Hamilton, by virtue of deeds of conveyance thereto by said John L. Hamilton to them in his lifetime and deny all other allegations in the petition.

Defendants then aver that "prior to the death of said John L. Hamilton, and on the twenty-ninth day of July, 1889, the said Hamilton made and executed his warranty deed wherein and whereby, for a good and valuable consideration therein named, he conveyed his said undivided one-half interest in and to the land in the petition described to the defendants, Susan J. McLean and Isabell A. Bates, and then and there delivered the same to said grantees, who thereafter and on the second day of August, 1889, and prior to the death of said John L. Hamilton, duly recorded the same in the office of the recorder of deeds of Buchanan county, Missouri, and the same now appears of record in said office in book 167, page 576; that in and by said deed all the undivided right, title and interest theretofore owned by said John L. Hamilton was conveyed to these defendants, Susan J. McLean and

Isabella A. Bates," and conclude with a prayer that the said half may be allotted and set off to them.

To this answer the plaintiff, on September 23, 1890, filed a reply, which, omitting the captions and signatures thereto, is as follows: "Plaintiff, for reply to the new matter set forth in the answer of defendants, denies each and every allegation therein contained; and further answering, plaintiff reiterates and charges as in his petition that the pretended deed referred to in the petition and set up in said answer, is not, and never was, the act and deed of said John L. Hamilton, but the semblance and pretense of such conveyance was procured by the solicitation and influence of defendants, unduly and fraudulently exerted over the said John L. Hamilton and at a time when the said John L. Hamilton was suffering and enfeebled from a severe illness, which, in a very short time, terminated his life, and when he was in the care and charge of said defendants as his nurses and attendants, and when he was incapable, by reason of such illness, to transact any business."

The cause was tried at the September term, 1890, and resulted in a decree for plaintiff, awarding him his own undivided half of the real estate and one-half of the half formerly owned by John Hamilton and the other half of that half to Mrs. Armstrong, and canceling the deeds of John Hamilton to Mrs. Bates and Mrs. McLean, of date July 29, 1889, because "procured from him by said defendants by fraud and undue influence; and that said deed was null and void."

This decree was rendered on the first day of December, 1890. On the next day the motion for new trial was filed. On the fifth of December, 1890, the motion for new trial was overruled. On the eighth of December the defendants filed their bill of exceptions, which were allowed, and the court on the same day

filed its findings of facts and conclusions of law, after the signing of the bill of exceptions. The defendants saved no exceptions to these findings and conclusions, and did not assign them as errors in their motion for a new trial, and it is now insisted that having failed to do so, there is nothing here for review.

The facts covered by the testimony are few and not complicated, but the amount involved is considerable, and it has resulted in a legal struggle characterized by great ability on both sides. The cause was heard in division one and the judgment of the circuit court was reversed with directions, but owing to a dissent of one of the members of that division, it was transferred to the court *in banc*, where it has again been argued both orally and in brief.

The facts developed are substantially these: Edward Hamilton, the plaintiff, John Hamilton, the deceased and Mrs. Eliza Armstrong, one of the defendants, were brothers and sister. They each inherited from their father a considerable estate. John and Edward, it seems, continued their father's business and held the real estate involved in this suit as tenants in common. They both resided in the old homestead in St. Joseph. Edward married, but John remained a bachelor until his death. In the year 1885, John L. Hamilton built two dwelling houses upon property owned exclusively by himself. These houses were very similar in structure and about the same cost. In 1886, John Hamilton ceased to live with his brother Edward and took up his abode in one of the houses he had built the year before. He invited his widowed and only sister, Mrs. Eliza Armstrong and her widowed daughter, Mrs. Isabell Bates and her child, a little girl, Lena, to become members of his household, and they resided with him as such, until his death in 1889. Mrs. McLean, the other niece, and her husband Finis

McLean lived in another portion of the city of St. Joseph. The only other relatives of John Hamilton, mentioned in the record or known to exist, were William Armstrong, a nephew, and his wife.

Much has been said on both sides of this controversy in regard to the relations existing between Edward and John Hamilton. It is in evidence that they did have differences, sometimes acrimonious, but afterwards settled, and John did not question the integrity of his brother but left to him the management and control of their joint or common property, and continued to visit Edward's house occasionally as long as he was well. Edward and his wife never visited John's house, or his sister and niece. Their residences were in the same neighborhood and adjoining, and during the three years that John lived in his own house, they never visited it, until it was known that he was very sick, in his last illness.

It was shown that when John Hamilton was building these two houses he stated to Mrs. Beekman, who had inquired why he built them alike, that one was for "Susie" (Mrs. McLean) and the other was for "Bell" (Mrs. Bates). He afterwards said substantially the same thing to George Brown, a witness. About eighteen months before his death, he said to his sister, Mrs. Armstrong, on the occasion of the death of General James Craig, "Sister, he was a wise man, and that is the way I have always intended to do with my own property." "*Wills can be broken but deeds can not.*" "I shall not leave you and Edward anything, *for you have sufficient, but what I have, all I have,* I wish to give to the girls," referring to Mrs. Bates and Mrs. McLean, "I wish them to have it."

He was then in good health. On the twentieth of July, 1889, John Hamilton was taken sick, and sent for his physician, Dr. Allen. The doctor prescribed for

him and on the next day he was much better and went out of doors, but on the twenty-second, he grew worse, and the doctor was called and found him with fever, quick pulse, and high temperature. From this time until his death the physician saw him at least once every day, and frequently twice or three times a day. The physician pronounced it a case of biliousness and remittent fever from the commencement of the case until the thirtieth of July, when he noticed typhoid symptoms. Dr. Richmond was then at the instance of Mrs. and Mr. McLean, called in consultation.

Dr. Allen, who testified at the instance of plaintiff, stated that up to the thirtieth day of July, the day after the deeds to Mrs. McLean and Mrs. Bates were made, he observed "no stupor, no coma." "There was nothing like delirium or wandering of the mind." "No incoherency." "His expressions seemed to be and were rational in every respect." On the thirtieth he began to show failing symptoms. On the twenty-ninth Dr. Allen reported to the family that everything was favorable. If the patient did not relapse, or have bad indications on the morrow, he hoped for a recovery. His condition seemed favorable. There was no weakness of the heart; the circulation was good. He slept without delirium. "In fact," he says, "I saw nothing in him indicating delirium." Mrs. Armstrong also says "I know his mind was perfectly clear." Indeed there is no evidence tending in the least to indicate that his mental capacity was in the least impaired, at any time prior to the thirtieth of July.

On the twenty-ninth of July in the forenoon John Hamilton had the family send for Mr. McLean, the husband of Mrs. McLean, one of the defendants. McLean was at his office in the business part of the city when he received the word, and came to Mr. Hamilton's residence. Mrs. Armstrong, the sister, was in

the room where her brother was.    When McLean came in John L. Hamilton had a conversation with him and told him he wanted him to have the deeds prepared and to attend to the preparation of them *himself.* McLean remarked to Hamilton that *he would rather he would employ Mr. White or Judge Grubb or some one else to draw up the deeds*, when Hamilton said, "No, Mac, I wish you to attend to it yourself." In accordance with the directions given him, McLean returned to his office and obtained the descriptions of the several tracts of land from the abstract books of the Messrs. Quigley, with whom he had an office, and then prepared three deeds.    One was a conveyance from John Hamilton of one of the dwelling houses to Mrs. McLean and another of the other house, to Mrs. Bates, and the third deed was a conveyance of the remainder of his real estate to Mrs. McLean and Mrs. Bates jointly. The latter deed only is the subject of controversy here. Later in the day McLean took the notary Quigley to the house of John Hamilton.    Quigley took his notarial seal with him.    He says he read all the deeds to Mr. Hamilton, including the one to the lands in this suit; that Mr. Hamilton signed and acknowledged them and he certified them in his presence.    Mr. Hamilton was weak and they had to prop him up so as to enable him to write his signatures.    The deeds were then delivered to Mr. McLean.

After the deeds were executed and delivered to McLean, Mrs. Armstrong says that Mr. Hamilton said to her he was "so happy" now that he had attended to this matter.    Mr. Hamilton was of the opinion he would never recover and so told his sister.    When it was discovered that he was very sick Mr. McLean wrote a note to plaintiff, Edward Hamilton, and he visited his brother during his sickness as often as he desired. John Hamilton requested his brother Edward, the

plaintiff, not to tell William Armstrong he was sick, that "he (William) would talk too much for him." Mrs. Bates and Mrs. McLean attended Mr. Hamilton during his illness. He required constant attention for about one week. He had servants to do the lifting and menial duties, but they prepared and served his meals and looked after his comfort, and administered the medicines. William Armstrong offered his services, but out of deference to the sick man's wishes they were declined.

After the deeds were delivered to McLean he placed them in a bureau drawer in the house until the morning Mr. Hamilton died, when he placed them of record before his death.

There is no evidence that Mrs. McLean or her husband, or Mrs. Bates, or Mrs. Armstrong *at any time suggested to John Hamilton* that he should make these gifts to these nieces, or *solicited it in any manner*.

Mr. Hamilton was about sixty years of age, of good education. He had retired from active business for many years. He permitted his brother Edward to manage their common estate and received monthly statements from him. At one time it would seem he had not been on very friendly terms with McLean, but for a year before his death they were friendly. Hamilton, however, had no business relations with McLean that were disclosed in evidence. There was a verbal statement of McLean's quoted by one of the witnesses to the effect that Mr. Hamilton consulted McLean about his business, but the overwhelming testimony is that he was not in business, and his brother managed his other affairs for him. The plaintiff did not testify nor offer to do so. The court excluded McLean, Mrs. McLean and Mrs. Bates as incompetent.

I.   The contention of respondents that the failure of appellants to except to the findings of fact and con-

clusions of law is fatal to their appeal, can not be sustained. We agree to the conclusion reached in division number one, that a proper construction of section 2135, Revised Statutes, 1889, requires that the judgment shall be the lawful sequence of the findings of law and fact as required by said section, and it necessarily follows that the request for and such findings must precede the judgment.

This case demonstrates how unfair and unjust any other rule would be. The plaintiff submitted his case without first requiring the findings of fact or conclusions of law. He obtained his judgment. The defendant within the four days allowed for a motion for new trial filed his motion; it was heard and overruled. His exceptions were tendered and settled, and after all this was done he was for the first time made aware that the court found certain facts and drew certain conclusions therefrom, but the time for making and saving his exceptions in his motion for new trial had expired. We think the bare statement of the proposition shows how unjust it would be to permit such a practice. The findings of fact and conclusions of law can not be considered a part of the record in this case and the fact that after the court had entered upon these findings the defendants requested and obtained from it certain findings or modifications favorable to them, does not affect the question. In the very nature of things the decree from which they appealed was not and could not be predicated upon these subsequent conclusions.

II. Coming, then, to the consideration of the case upon its merits, we are met at the threshold with the claim that we must assume from the relationship of the donor and the donees that these deeds are invalid. Counsel assume that the facts in evidence show that Mrs. McLean and Mrs. Bates, stood in such a confidential relation to their uncle, John Hamilton that the

deeds by him to them must be presumed to have been obtained by undue influence.   It may as well be stated at once, that there is no evidence of any actual fraud in the record, nor is it asserted in the briefs of respond- ent.   The judgment for the respondent must be sus- tained, if at all, because the facts bring it within the equitable rule which forbids one holding a confidential relation to another to use the influence obtained thereby for his own benefit, or in other words, that the deeds were, in the eye of the law, obtained by undue influ- ence.

"The jurisdiction exercised by courts of equity over the dealings of persons standing in fiduciary rela- tions has always been regarded as one of a most salu- tary description.   The principles applicable to the more familiar relations of this character have long been set- tled by many well known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise.   Wherever two persons stand in such a relation that, while it con- tinues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confi- dence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advant- age at the expense of the confiding party, the person so availing himself of his position, will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential rela- tion existed."   White & Tudor's Leading Cases in Equity, vol. 2, part 2, page 1156; *Tate v. William- son*, L. R. 2 Ch. App. Cas. 55; *Huguenin v. Baseley*, 14 Ves. 273.

The assumption that Mrs. Bates and Mrs. McLean bore a confidential relation to their uncle, John Hamil- ton, from which undue influence might be presumed, merely because they were his nieces, and the natural

esteem and affection which should characterize that relation existed between him and them, unaffected by any other relationship, can not be maintained either by reason or authority.    There is ordinarily no presumption that the gift of a parent to his or her child is invalid when the parent is of sound mind, nor is there any more reason in a case like this, where the donor who has no wife or children makes a gift to his nieces, for indulging such a presumption.    2 Pomeroy's Eq. Juris., sec. 962; *Moore v. Moore*, 67 Mo. 194.

But the plaintiff insists that, in addition to the ties of blood and kinship, the fact that Mrs. Bates and Mrs. McLean nursed their uncle during the few days of his last illness will effectually raise the presumption.  There are doubtless cases to be found in which nurses, having exclusive access to the sick person, have used their positions to acquire dominion and undue influence over the minds of the unfortunate, and in such cases, whether relatives or strangers, gifts obtained by means of such influence were set aside, and ought to have been, but it seems to us to apply that rule to the facts of this case would be to ignore the reason of the rule itself.

In this case, Mr. John Hamilton had neither wife nor child.   To compensate himself in part for the deprivation, he had built him a home and called about him his only sister, Mrs. Armstrong, and her widowed daughter, Mrs. Bates, and an only child.   Mr. Hamilton was a man of sixty years, of ordinarily good health, with no indication of impaired intellect.   He was the master of his household.   He was taken sick on the twentieth of July.   His regular family physician was immediately called.   He prescribed, and the next day Mr. Hamilton was much better, and went out of doors. On the twenty-second he was worse and his physician discovered he had fever.   His fever never abated, but

on the twenty-ninth and thirtieth he was so much better his physician hoped for his recovery, and so reported to the family, but during the thirtieth typhoid symptoms appeared.  Another physician, Dr. Richmond, was then called in consultation, and he grew steadily worse and died August 2, 1889.  When it was discovered that his sickness was serious, Mrs. McLean came over from her home in another portion of the city and assisted in nursing him.  His brother, the plaintiff, was notified of his illness and came when and as often as he desired to visit him.  In fact all of his relatives were with him, save Mr. William Armstrong, and Mr. John Hamilton requested his brother, the plaintiff, not to tell William because he feared *"he would talk too much."*  Mrs. Armstrong, his sister, says she was too feeble to give her brother the necessary attention, and her daughters, Mrs. Bates, and Mrs. McLean gave him all the attention he needed.  He had several servants who performed the menial duties about his sick room, and his coachman lifted and turned him in bed when he needed it.  In a word, there was nothing, from first to last, that indicated *any secrecy about Mr. Hamilton's illness;* or the exclusion of any of his relatives except William Armstrong; and the services rendered by Mrs. Bates and Mrs. McLean were *such and such only as were prompted by natural affection* to sooth his dying hours, and the law is not so heartless as to ascribe to these last simple offices of affection a mercenary motive.  As said in *Maddox v. Maddox*, 114 Mo. 35, "we hope it will never be that the visits of a son to an aged and infirm parent will be looked upon with suspicion and attributed to selfish motives."

Our conclusion is that the mere fact that these nieces of John Hamilton attempted to make him comfortable during the last week of his life will not raise a presumption of the invalidity of these deeds.

But again it is said, the deed must be presumed invalid because Finis McLean, husband of one of the donees, drew it, and it is asserted that he bore a confidential relation to Mr. Hamilton, growing out of intimate business connection for a long time. On this point the evidence is that Mr. Hamilton and Mr. McLean were friendly. McLean was the husband of his niece. Before Mr. Hamilton built the two dwelling houses, he visited Mr. and Mrs. McLean in their home, and after he had established his own home, they visited him. Their relations were pleasant and friendly. Her mother and sister resided with him. Upon cross-examination of Mrs. Armstrong, she was asked if Hamilton did not have great confidence in McLean, and she said "Yes." She was also asked if he did not trust him in all his affairs, and she answered "Yes." She was asked if he would undertake anything important without consulting him, and she answered "No," but before counsel finished his cross-examination of this witness, he developed that for twenty-five or thirty years John Hamilton did not transact any regular business, further than to make monthly settlements with his brother Edward, the plaintiff. All of their joint property was managed by Edward, and this statement of hers was confirmed by William Armstrong, plaintiff's witness. So that it very clearly appeared that Mr. McLean did not bear any confidential business relation to John Hamilton, from which undue influence could be presumed. In fact he had no business which required McLean's advice or assistance. All of his business was in the hands of his brother, in whose integrity he had implicit confidence, notwithstanding occasional family disturbances at times marred the pleasure of their intercourse. The fact is that this record does not disclose a single business transaction in which McLean represented John Hamilton or in

which Hamilton sought his advice or was governed by his opinion prior to the drawing of these deeds for him. We find no relations between them from which we could infer that McLean might by reason thereof exercise a dominion over Mr. Hamilton. *Samson v. Samson,* 25 N. W. Rep. 233.

But the fact that McLean drew the deeds which conveyed this large estate to his own wife and her sister, is a transaction calling for the most jealous scrutiny, because if his conduct in this matter is tainted with the slighest injustice or wrongdoing it must avoid the deed, notwithstanding his wife and her sister were guilty neither of fraud nor any undue influence in procuring said deeds. *Yosti v. Laughran,* 49 Mo. 594; *Bridgman v. Green,* 2 Vesey, Sr. 627; *Huguenin v. Baseley,* 14 Vesey, Jr. 273. But a presumption of their invalidity does not arise from that fact alone as contended by the plaintiff.

For this proposition we are referred to the masterly discussion of Lord BROUGHAM in *Hunter v. Atkins,* 3 Mylne and Keen, 113. In that case a retired English admiral made the gift to his friend of forty years standing, Alderman Atkins, who had his confidence to a large degree, and was accustomed to advise him in certain business matters, to quote: "He had been in habits of intercourse with him both in society and in business for many years, and he was employed as his agent and banker; that is, he acted professionally as his navy agent, received and paid away his money, * * * and was naturally consulted by him in his money matters." Beyond this the agency did not appear. Upon this relationship Lord BROUGHAM held: "That the circumstances of the case do not warrant the court *in ascribing the deed in question to undue influence or influence improperly exerted over a person, either of insufficient understanding, or under the control or manage-*

*ment of another*—the dupe of his artifices, or the victim of his contrivances, or subjected to his sway." He stated the rule to be that "where the only relation between the parties is that of *friendly habits* or *habitual reliance on advice* and assistance, accompanied with partial employment in doing some sort of business, care must be taken that no undue advantage shall be made of the influence thus acquired." "A confidential adviser, one who has been generally consulted in the management of the person's affairs, though he may also have been employed specially in his business, *does not lie under the same suspicion with an attorney or a steward, or any one who has a general management.*" He said: "In *Pratt v. Barker,* 1 Sim. 1, 4 Russ. 507, the object of bounty was one who had been employed for many years as the surgeon and apothecary of the donor, had received his dividends for him, and had oftentimes been consulted by him respecting the management of his property. Through him the instructions to frame the deed were conveyed to the donor's solicitor, who so far deviated from those instructions as to leave a blank for the donee's name till he saw his client; and because it was proved that the donor understood the nature of the gift, and had the deed read over and explained to him, the court refused— *and without hesitation or even hearing the defendant—to set it aside.*" Lord BROUGHAM, in this case of *Hunter v. Atkins*, further observes: "In a case of this description much depends upon the character and prevailing humor of the person who is alleged to have been the dupe of designing men."

Subjecting the conduct of McLean to this scrutiny and suspicion aroused by the fact that he drew the deed conveying all this property to his wife and her sister, what do we find? We have in the donor a man of clear intellect, with no evidence of impaired mind.

This proof comes from the plaintiff's own witness, the physician, Dr. Allen, and no question as to his competency was raised by defendants, that John Hamilton exhibited no sign of mental weakness until the second day after this deed was drawn. Edward Hamilton, the plaintiff, visited him, and he did not offer to testify that his brother was not fully conscious at the time of this transaction. When McLean was requested to draw these deeds, he at once advised Mr. Hamilton to employ Judge Grubb or Mr. White to do it, very properly declining in the first place to do it himself, and suggesting competent counsel, and the evidence absolutely refutes all idea of solicitation by McLean or the donees. On the contrary Mr. Hamilton very positively expressed his own desire that McLean himself should attend to it.

Now in drawing these deeds there is no evidence of undue haste. McLean's conduct clearly indicates that he did not deem the matter so urgent that he could not return to the city, procure a correct description of the lots from the abstracts, obtain suitable blanks and prepare the deeds. This he did do and took the notary to the house to take the acknowledgment. The deeds were drawn in exact accordance with the purpose expressed long before to his sister, to Mrs. Beekman, and to Mr. Brown, when he was in perfect health.

So that there is no mental imbecility; no change of his long expressed intention; no solicitation by either of the donees; no disposition by McLean to act as his attorney in drawing the deed, but a positive reluctance, and proper advice given to employ Judge Grubb or Mr. White. Nor was there anything unnatural in the gift itself. No stranger obtained his property. It was a provision for his own blood. He knew that his sister and brother had all they needed, and

next to them, these nieces were the natural objects of his bounty. The discrimination against William Armstrong doubtless grew out of the annoyance which Mr. Hamilton had suffered from his arguments with William about religion. So that while we hold it is our duty to scan this transaction closely, to see that no undue influence was exerted, yet as was said by Lord ELDON in *Gibson v. Jeyes*, 6 Vesey, 266, "*this is done when it is shown, that the donor knew and understood what it was that he was doing*," and in *Huguenin v. Baseley*, "that the *intention* was not produced," by such influence. And we are satisfied that his intention to dispose of his property in this way was a well settled purpose long before his illness, and long before his nieces were required to render him the last offices of affection, and that no undue influence exerted by them produced that intention in any manner.

But it is urged again that the fact that John Hamilton gave away all his estate to his nieces, of itself raises a presumption against the gift. We think the rule unquestionably is that the fact that Mr. Hamilton gave away his whole estate, requires strict and satisfactory proof of all the essentials of a valid gift. That a man of sound mind may voluntarily give away all he has can not be questioned, but when such a transaction comes under review, the donees must show that he fully understood the nature of the gift and its consequences to him, and those dependent on him. As already said we have no doubt that John Hamilton fully understood what he was doing, and to whom he was giving his property when he executed these deeds. They were read to him, and were simple grants in fee simple. Nor have we any doubt that he had concluded in his own mind, he would not recover from his sickness, and determined that he would not make a will, but would convey the property to his nieces by deed in his life-

time, and we have no hesitancy in saying, that under this evidence, he could not have set aside these deeds, had he recovered, and desired to do so, as they were the acts of his own free will, uninfluenced by the grantees. So that the evidence meets all the requirements of good gifts *inter vivos*, nor do we think there is any evidence that he intended them as gifts *causa mortis*.

Much space is devoted to an argument that the deed was never delivered. Appellants' possession of the deed, duly acknowledged, and putting it to record in the lifetime of Mr. Hamilton, made a *prima facie* case that the act of execution was a voluntary act. *Clark v. Edwards' Adm'r*, 75 Mo. 87. We think the conclusion reached by division number one was correct as to this point also.

In the original brief filed by counsel for respondent in division number one, no stress was laid on the question of delivery further than to say that "the appellants are in error under the ninth point in their original brief, in stating the delivery was admitted under the pleadings. The evidence shows there was no delivery." No citation of authority was made and no reasons urged why the delivery was not sufficient; but on the motion for rehearing, in the division, the non-delivery of the deed was urged with great earnestness.

The pleadings were clearly drawn with the view that the deeds were obtained by fraud and undue influence. The allegation was that defendants claimed by certain conveyances which were procured by fraud and undue influence, and this was evidently the view of the trial court, and such its findings in the decree itself. These deeds were executed in pursuance of the positive direction of John Hamilton; they were read over and explained to him by the notary; the instruments were completed in his presence, and by his direction were delivered to Mr. McLean, the husband of one of the

grantees. He then expressed his gratification to his sister that it was done, and never expressed the slightest wish to retract them after they were made. If we are right that these were the acts of a man in his sound mind and conscious of what he was doing, the delivery of these deeds to McLean after all this preparation and expressed desire was a delivery for the benefit of these donees; otherwise the whole performance was a solemn farce. Where the instruments are voluntary, as in this case, the intention of the grantor is most important. That the formal preparation and execution of these deeds and the delivery to McLean indicated the intention on the part of John Hamilton to deliver them to the donees is, under the circumstances, perfectly clear, and that was all that was necessary to give them that effect. It was not necessary to place them in the hands of his nieces. *Cannon v. Cannon*, 26 N. J. Eq. 316; *Sneathen v. Sneathen*, 104 Mo. 201; *Crowder v. Searcy*, 103 Mo. 97; *Standiford v. Standiford*, 97 Mo. 231; *Harris v. Hopkins*, 43 Mich. 272.

But it is urged that there was actual undue influence. The plaintiff introduced the three deeds already alluded to, and called Dr. Allen. His testimony simply details the nature and progress of Mr. Hamilton's disease. He regarded it merely as a bilious fever until the twelfth day, or the thirtieth of July. It shows also a great solicitude by Mrs. Bates and Mrs. McLean. They requested to be notified of any unfavorable symptoms and desired a consultation. He promised to advise them but failed to do so and on the thirtieth they again requested it and he agreed to it. He testified that the family nursed Mr. Hamilton, but he gave no evidence of any influence or dominion that any one of them exercised over Hamilton.

The principal witness to show that these deeds were obtained by undue influence was William

Armstrong, the brother of defendants and the nephew of John Hamilton. From his evidence it is apparent that he was an impractical man. He volunteered the statement that "he belonged to the Lord and didn't know any other business;" that for three or four years that had been his sole occupation. It appears that when he moved back to St. Joseph about 1877 Mr. John Hamilton called upon him two or three times, but Armstrong undertook to convince Mr. Hamilton that his ideas of the Bible were all wrong and these conversations became so unpleasant to Mr. Hamilton, that when Armstrong visited his mother at Mr. Hamilton's house, he declined to come in and see him. He testifies that his uncle was a man, sixty years of age. He says, "John Hamilton was a very sensible man." "He was a learned man in a few hobbies and things like that." "He was a good mathematician." As to his intercourse with him he says, "I had not seen John L. Hamilton for months before his sickness." During Mr. Hamilton's last sickness Mr. Armstrong and his wife called to see his mother and learned that his uncle John was sick. He says it was Monday or Tuesday, but was inclined to think it was Monday. He fixes the date of the month as the twenty-ninth or thirtieth of July. He says his mother or sister told him his uncle had taken cold from having his hair cut on Thursday. He did not see his uncle during his last illness. He says he asked to see his uncle and offered to nurse him and his services were declined.

The witness over the objection of defendant was permitted to go at length into a family difficulty. He says that at one time there was a serious rupture between the two brothers and his mother in a matter; that he consulted his wife and they felt it their duty to bring about a reconciliation. He spoke to his uncle Edward, and Edward said that Mrs. McLean had

turned John against him. He then went to John and John said there was nothing the matter. Mrs. Armstrong, his mother, his two sisters and John Hamilton, were all members of the church. Not crediting his uncle John, he went to Mr. Campbell, his mother's minister. At his urgent solicitation he says Mr. Campbell went to see his mother, and the next he heard of it, Mr. and Mrs. McLean came to his house to inquire why he had sent Mr. Campbell up there to abuse his mother. Mr. Campbell stated that William and his wife said his mother ought to be kicked out of the church. He says: "I remarked to Mr. Campbell that they should be sent out of the church if they stood in the way of the souls of these two men." He says he charged his sister with preventing a reconciliation and she said nothing. He admits she said nothing from which he could infer she was opposed to a reconciliation. He says when he first came back to St. Joseph in 1887 Mr. and Mrs. McLean told him and his wife that she was going to get uncle John to write for a notary and have her mother make a will in the hopes he would fall in behind her mother and he would make her (Mrs. McLean) an heir. He says McLean and he laughed at her. He had no more conversation about Mr. Hamilton's estate until after his death.

He received a note from his mother, in her own handwriting, asking him to come and see her. When he came, she read or showed him a statement in the St. Joseph *Herald*, stating it was probable a suit would grow out of the Hamilton estate, and wished to know if he had put that in the paper, and if "*I was going to sue my sisters*. I told her I had not." She told him she had made her will, giving him one-third of her property, but if he sued his sisters, or brought trouble on her gray hairs, she would cut him off without a cent. He says, "I told her her threat amounted to

nothing; that I didn't need any money; I was God's child; he took care of me; that he would denounce what they had done; that, if he didn't, he would be a party to the iniquity. They (his mother and sisters) spoke of me suing them all." They told him he was crazy. He said Mrs. McLean defied him to do his worst. He heard no statements made about the deeds save that his mother told him his uncle had made the deeds to the girls, as Edward had plenty and she had plenty, and his sister reiterated it.

Over the objections of defendants, plaintiff read a letter from Mrs. Armstrong, written July 9, 1890. In this letter she alludes to his visit on the previous Monday and his desire to go to farming, and tells him that she has talked with his sisters, and they say, when the suit is decided, and they get their inheritance, they will give him a farm. She assures him that they are willing to forget past differences, and they will do as they say. Witness then details how on one occasion he thought of taking his wife's sister to see his uncle John, but, through his sister's influence, was prevented. He ascribes it all to a fear that Mr. Hamilton would become enamored of his sister-in-law, and their plans for obtaining his property be foiled.

Mrs. Armstrong, the wife of William Armstrong, testified to family disagreement, and to the fact that she called with William on his mother, and learned of Mr. Hamilton's illness, and William asked to see him, and they gave the excuse that he didn't like many around him.

All of this evidence of these two witnesses amounts to this: There was some family disagreement. William Armstrong called in the preacher and intensified the trouble. It has not the remotest connection with this case. A large part of it is pure hearsay. The supposed conspiracy of Mrs. McLean is built upon the

statement that she said she was going to get her uncle to write for the notary to write her mother's will, hoping he would fall in behind. · Had it been shown she really had him write the letter for the notary, and the notary had come, and John had yielded to this delicate hint, we hardly think any court would have declared it undue influence; but, when it nowhere appears that she had him write the letter, or that the notary came and wrote her mother's will, or that John Hamilton, moved by the gentle insinuation, made a will, in her favor, it seems frivolous. In other words, in the light of reason it amounts to nothing.

The one other fact supposed to indicate fraud was the refusal to accept William's services as a nurse. At first blush it would seem he ought to have been permitted to render this small favor to his uncle, but, when it appears from his mother's evidence that John Hamilton had expressed a desire not to see William, it is plain they were only consulting his desires. Nor do we think her evidence as to this is open to comment. Edward Hamilton was a competent witness in this case. This statement was shown to have been made to him, and he silently acquiesces in it. So that the evidence of William Armstrong and his wife prove no substantial fact upon which a judgment could be rendered. The allegation of the bill is that this undue influence was exerted at a time when John L. Hamilton was suffering and enfeebled from a severe illness, and when he was incapable of transacting any business. When the plaintiff closed his case he had shown the execution of the deeds, the relationship of the parties, and that John Hamilton's mind was clear and unaffected by his illness.

The evidence of Mrs. Beekman shows she was requested to send Mr. McLean to the house. He came. Mrs. Armstrong then tells us that Mr. Hamilton then

directed McLean to prepare these deeds; that McLean went to the city, prepared them, and during the. day brought the notary, who took the acknowledgment. Mrs. Armstrong, who was deprived of an estate worth many thousands of dollars by these deeds, rebuts all presumption of secrecy, or dominion, or undue influence. She tells us Mrs. McLean was not called to help until the twenty-fifth. He executed the deed on the twenty-ninth. Mrs. Armstrong, who was in and about the sick room continually, says there was no solicitation by her daughters for these deeds.

Counsel for respondent in their brief *in banc* say, "We mean nothing of what we have said to discredit Mrs. Armstrong, either in this court or elsewhere," but it is elsewhere intimated that she sought to bribe William Armstrong not to testify against her daughters. We think Mrs. Armstrong's evidence is frank and candid. It is not the evidence of a weak or corrupt woman, and we think it is no credit to either her brother or her son to assail her as guilty of subornation of perjury on grounds so slight and ill-founded.

We have gone at length into all the grounds alleged for setting aside these deeds and have reached the conclusion that to uphold the decree of the circuit court on such a state of facts would be to deprive men of sound mind of the right to dispose of their property. *Ralston v. Turpin*, 129 U. S. 663; *Conley v. Nailor*, 118 U. S. 127. John Hamilton was an intelligent gentleman. His mind was unimpaired by disease when he determined to give his property to his nieces, and when he executed the deeds. His gift was a natural one under the circumstances, and there is nothing to show that either of the donees or anyone for them in any way procured the execution of these deeds.

The judgment of the circuit court is reversed and.

the cause remanded, with directions to enter a decree that partition be made between plaintiff and Mrs. Mc-Lean and Mrs. Bates, awarding to Mrs. Bates one-fourth of said lands and to Mrs. McLean one-fourth thereof, and to proceed in accord with this opinion. BLACK, C. J., BRACE, BURGESS, SHERWOOD and MAC-FARLANE, JJ., concur. BARCLAY, J., dissents.

BARCLAY, J. (*dissenting*). In this case the question whether undue influence was in fact exerted depends for its decision upon conflicting evidence. The case was tried on the circuit by a very able and experienced judge who found in favor of plaintiff on that issue. There is no such preponderance of testimony against that conclusion as satisfies me that it is incorrect; and hence my concurrence is not given to reversing it here, where we have not had the benefit of a personal view of the witnesses, on whose credibility the result, in a large degree, rests. Hence my vote is for the affirmance of the judgment.