SUSAN STANFIELD et al., Appellants, v. SARAH J. HENNEGAR.

Division One, June 2, 1914.

1. **SUIT TO CANCEL DEED: Mental Capacity: Evidence.** The evidence, in a suit to cancel a deed, *held* not to show mental incapacity in the grantor, but rather that, while the grantor was old and suffering from the cerebral ailments incident to a hardening of the arteries, he knew what he was doing when he made the deed, understood its nature and consequences, and, in fact, made it by way of carrying out a fixed purpose which he had entertained when there could be no question as to his mental capacity.

2. ————: **Undue Influence: Performance of Filial Duties.** The law does not look upon the faithful performance of filial duties as an element of fraud, nor does it lay its restraining hand upon the substantial recognition of their performance.

3. ————: ————: ————: **Evidence.** Evidence in a suit to cancel a deed from an aged father to a daughter who had long been his housekeeper, companion and nurse, *held* to sustain a finding that the deed was not procured by undue influence.

Appeal from Greene Circuit Court.—*Hon. James T. Neville*, Judge.

AFFIRMED.

*Wright Bros.* and *T. H. Jones* for appellants.

(1) The law presumes that the deed was the result of undue influence, and the burden was on the defendant to explain that the deed was not the result of such undue influence. Kincer v. Kincer, 151 S. W.

424; Hall v. Knappenberger, 97 Mo. 509; Street v. Goss, 62 Mo. 226; Allmon v. Jewell, 94 U. S. 506; Griffith v. Godey, 113 U. S. 89.   (2)   The evidence shows the relation of the defendant to George Creason, and that she ministered to his health, etc., and also shows the conveyance pending the relation. It is therefore not necessary for plaintiff to show fraud or imposition.   Street v. Goss, 62 Mo. 226; Ryan v. Ryan, 174 Mo. 279.

*Hamlin & Seawell* for respondent.

There were no undue influences in this case.   "It must be an influence exerted *mala fide* to produce a result which the party, as a reasonable person, was bound to know was unreasonable and unjust; and it must have the effect of producing illusion or confusion in the mind of the testator, so as either to overcome free agency, or power of judging upon the true relations between himself and those who might be supposed to have just claims upon his bounty."   1 Redfield on Wills (3 Ed.), sec. 38, par. 38.   "It must not be such as arises from the influence of gratitude, or esteem, but it must be the control of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will."   Ib., sec. 38, par. 47; Carl v. Gabel, 120 Mo. 283.   "The influence must be such as amounts to moral coercion."   Norton v. Paxton, 110 Mo. 456; Von De Veld v. Judy, 143 Mo. 348.   There was absolutely no evidence showing want of capacity.   McKissock v. Groom, 148 Mo. 459; Cutler v. Zollinger, 117 Mo. 92.   "If a person understands the nature of the business in which he is engaged, and the effect of what he is doing, his acts are valid and this is true though the mind of such person may be impaired by age or disease."   Cutler v. Zollinger, 117 Mo. 92.

BROWN, C.—This suit was begun in the Greene County Circuit Court September 3, 1907. Its object is to cancel a deed made by George Creason, deceased, in his lifetime, which purports to convey to his daughter, the defendant, forty-seven and one-half acres of land, being the west part of the home farm owned and occupied by him during his life with buildings thereon. The plaintiffs are Susan Stanfield and Elizabeth Morton, two daughters of George Creason, the plaintiff Thomas J. Creason, one of four living sons, and also the children of two deceased daughters. The sons not parties to the suit are Robert J. Creason, James H. Creason and John T. Creason. These plaintiffs and defendant, together with the three sons last named, are the only heirs of George Creason, who left a will which does not, so far as any purpose of this suit is concerned, change the course of their inheritance, and we will accordingly ignore it. The grounds stated in the petition for the relief asked are mental incapacity of the grantor and undue influence over him by the grantee.

*Suit to Cancel Deed.*

Mr. George Creason died January 21, 1906, aged eighty-eight years. His wife had then been dead about fourteen years. His daughter Mrs. Hennegar, the defendant, was married quite young, and had two children. Her husband then died and she came with her children to reside with her father and mother about 1870, and continued to reside with them during the entire thirty-five or thirty-six years intervening between that time and her father's death. Mr. Creason although uneducated was a man of great force and intelligence. Mr. Forrester, his brother-in-law, a minister of the gospel, testified for plaintiff and described him as follows: "Previous to his affliction, I don't think I ever knew a common man, just an ordinary uneducated man, who had as strong a mind and as much business qualifications as George Creason had. He had a discerning mind; a penetrating mind, and he

kept his business straight." Mr. Creason's health began to fail in consequence of some kidney or bladder trouble which also seemed to affect his heart, and he had attacks of difficult breathing, although under ordinary conditions it did not interfere with his ability to get around and attend to his business. During this time he frequently expressed his intention to convey to Mrs. Hennegar the land in controversy here, which he described as the west part of his home place, including the buildings and well, for the purpose of securing her a home. He called her Kittie, and said that he wanted her to have that home; that she had been there with him, and that he intended that she should have it. He had one of his bad spells which began about the 28th of May, 1905, when Dr. Brown was called to attend him. When these came he could not lie down with comfort and would sit in his chair on the porch. He was broken up nervously and was afraid of death; saying that he did not care about dying, but that it was the pain and punishment that preceded it which he dreaded. Mr. Wood, a neighbor, called to see him, and he asked him to see Judge Bristow, who seems to have been a neighboring justice of the peace, and to ask him to come around and make the deed. Squire Bristow came on May 31 for that purpose. Mr. Forrester and Doctor Brown, who was making his call that day, were there as were also Thomas and Robert Creason. The boundaries of the tract he desired to convey to Mrs. Hennegar were very irregular and it was questionable how much land off the west side it would take to include the buildings, and the boys stepped it off and ascertained to their satisfaction, and apparently to the satisfaction of their father, where the line should run. Squire Bristow then began to struggle with the description, but gave it up. Doctor Brown, who thought he could do it, then tried and was unable to get it right, and the result was that they advised Mr. Creason to get a lawyer to write the deed.

He was considerably perturbed at this, saying in substance that he was afraid he might die before the next day. He was acquainted with the Gideons, and at first talked about getting Tom Gideon to do it, but at Mr. Forrester's suggestion he told his son James to go and get Mr. Murrey. James had brought him the blanks for the purpose a month or six weeks before, and had talked over with him what he wanted to do, and understood that Mrs. Hennegar was to have the west side and Charley was to have the other side of the place and also a building lot near the barn and house, so that he would be handy to them, and was to pay the girls $1200, which was about its fair value, and was to be secured on the land. It was arranged before they separated that Squire Bristow was to return the next day to take the acknowledgment of the deeds. James took the old deeds into town the next morning, and had Mr. Murrey write the deeds to Mrs. Hennegar and Charley, and brought them back and left them with his father, who executed them the same day in the presence of Mr. Forrester and some of the family, and the acknowledgments were taken by Mr. Bristow. The object of making the deed to Charley was two fold. It enabled him to build on the land and be near his mother, and it converted the land into money for distribution as had been already provided in his will. James testified that his father sent for him and told him he wanted him to go to town and get the deeds, and that he said: "Father, if nothing else will do you, I guess I can come and get the old deeds." His father said: "What is the matter with you?" James said, "When it comes to a show-down, I will tell you. I don't believe it is right the way you are going to make the deeds." During this talk Mrs. Hennegar came in and wanted to know if he (James) was going to beat her out of it and he told her no. He testified that he said: "I told her I thought it wouldn't beat her out of it if we raised her children and took care of

them, and I didn't think she ought to have it.    It was worth something to raise the children." He further testified that when Mrs. Hennegar came to her father's she had two children, Charley and a daughter two or three years old.    She came after her husband's death and had some property and helped support her children as well as any of them.    She made her home there and helped the same as before her marriage, and all helped to take care of her.

Doctor Brown, the attending physician, had known Mr. Creason ever since he (the doctor) was a lad, and was his physician the last years of his life. He testified as follows: "I treated him in a little spell before his last spell; his physical condition in May and June, 1905, was very bad.    I heard some conversations when Mr. Bristow and Mr. Forrester were there about some deeds.    My first visit was made May 28.    I was called to see him; called, I think, late in the afternoon, stayed all night with him; was there the 29th twice, remained almost all night.    Was there twice on the 30th, memorandum in book, 'detained;' stayed some time until he got quieted; called next day once, remained perhaps as much as two hours, called once June 1, stayed an hour or two.    I visited him until June 19.

"Q.    Now, independent of your book, you recollect having been there on those occasions?    A. Yes, sir.

"Q.    Now state to the court what was George Creason's physical and mental condition at that time along about the time you were called there and up to June 1?    A.    Well, at that time he was in a great state of agitation, mentally and physically; it was very hard to do anything with Mr. Creason at that time, that is, to control him to get him to obey orders such as we thought best for him.    It was hard to keep him in the house; he wanted to get out doors, and he would stand and hold to a post or we would have to hold him

Stanfield v. Hennegar.

sometimes to keep him from falling and he was continually talking about dying, and crying and such as that.

"Q. Now, what do you say in reference to his mental agitation; what was his mental condition? A. Well, his mental condition was but a functional derangement of his brain, and it was due to a poor circulation of blood in his brain. Mr. Creason had what we call athromatic degeneration of the blood vessels; hardness of the blood vessels. He complained of blindness and dizziness; couldn't see. Sometimes he couldn't see well enough to hardly tell who it was. At those times we would ask him if he knew certain ones; it seemed like sometimes he would and sometimes he wouldn't. This was during the worst part of his spell. I think it was the latter part of May, or first part of June. We call that mania; that was a mitral delire. He would talk out of his head sometimes too; talk to himself; it was a state of his brain, senile changes, I think, more than anything else, at his old age. Mr. Creason had heart trouble too, but then the trouble with his heart was due to the same thing that hardened these blood vessels. The valves had become stiffened, and his circulation was not strong. On the occasion when Mr. Bristow and Mr. Forrester and these members of his family were there, I was uneasy about him because he seemed to be very much agitated. He was crying and it seemed like it was a difficult matter for them to get a little business attended to. I was afraid that he would have a rupture of a blood vessel in his brain or heart failure or something like that. I tried to quiet him down; tried to get him to sit down and keep quiet, and of course proceeded to give him something to quiet him, medicine. I don't remember exactly how long I stayed that day. I wouldn't mark any detention unless it had been over an hour or probably two. The 31st of May, I was not there over a couple of hours, I guess.

"Q. That was the condition in which you found him that day? A. Yes, sir. On the first day of June it was a good deal the same, about the same except not so much excitement, but then I don't think there was a time that I was ever there during that bad spell of sickness but what he would cry and have a good deal to say about things, about dying, and first one thing then another that showed he was extremely distressed in his mind. On the 31st of May something was said about the manner of attending to that business to me and I told them that I thought they had better put it off until tomorrow and see a lawyer about it. I didn't think they could attend to it and I didn't like for Mr. Creason to be agitated any longer and I didn't really think he was in a condition to attend to business.

"Q. Now, from your knowledge of his condition physically and mentally at that time, state to the court whether or not in your judgment as a physician, he was capacitated or incapacitated to attend to business on that day. A. No, I don't think he was competent to attend to business on that day. He was very childish most of the time along those days. Mr. Creason's brain, I think, was slightly demented, that is another way of speaking of insanity. He was not a crazy man from brain disease. The disturbances that were in his brain were functional I think on account of bad circulation, and then another thing, he had very difficult breathing. He had what we call cardiac asthma; that is, asthma associated with bad action of the heart, and then in that condition of course his blood would be overcharged with carbonic acid gas, and then he was intoxicated from that to a certain extent. That would make him somewhat delirious. His bowels were swollen but that was on account of the inactivity of the bowels; obstinate constipation. It was a very difficult matter to get them to operate. Sometimes there is a toxic material that is absorbed in the bowels that causes fever, and by the prevention of elimination

on account of inactivity of the bowels there wouldn't be a sufficient amount of waste carried out, and that would intensify the fever.   He got pretty thin during the progress of his trouble, his face was swollen most of the time; his lips puffed, just as long as he had that difficult breathing he had some puffiness about the face."

Mr. Creason's last sickness, or "spell" as it was called in the testimony, began the following November and lasted until the time of his death.   About the first of December Mrs. Hennegar "broke down" in health and went to her daughter's to recuperate and a family meeting was held to determine who should take care of the father.   Thomas and his wife came to the house and stayed a while, but the wife could not stand the presence of the suffering, and had to give it up.   Then Robert and his wife came, and stayed until their father's death in January.

The relation of Mrs. Hennegar to her father is described in appellants' printed argument as follows: "The defendant had lived in his household for many years.   She was his daughter, his housekeeper, his companion, his nurse much of the time, and ministered to his health, wants and comfort, and wielded a great influence over him.   She also attended to portions of his business."

The court, upon the pleadings and evidence, dismissed the petition and entered final judgment for the defendant, from which an appeal was taken to the Springfield Court of Appeals, from which it was transferred to this court.

I.   While, in their fifth assignment of errors, the appellants say that the evidence clearly shows that George Creason was of unsound mind when he executed the deed they now seek to set aside, they have, in their brief, neither set forth their reasons for this claim, nor have they attempted

**Mental Capacity of Grantor.**

259 Mo.—4

seriously to support it by argument.  As a matter of fact it clearly appears in the evidence that the execution of the deed was in accordance with a fixed purpose which he had entertained when there could be no question as to his mental capacity; and that when, in the progress of a disease that continually kept before him the apprehension of a fatal result from the failure of the degenerated tissues of his arteries, he was seized with an attack of more than usual violence, it was natural that he should hasten, and he did hasten while there was yet time, to carry out that purpose.  We have carefully read the evidence, and find no hint in it that, although he was nervously affected by the cerebral conditions that characterized the attack, he did not know exactly what he was doing; understand perfectly its nature and consequences, nor that he swerved a hair's breadth from his deliberately formed purpose. We have quoted in full the testimony of his attending physician to show that his reluctance to have his patient transact the business arose from fear of the consequences rather than from doubt as to his understanding of its nature and object, as well as of the details necessary to its accomplishment.  So far as this point is concerned, we will follow the example of the appellants' counsel, and dismiss it from our consideration without further argument.

II.   The real question presented is included in the assertion that the law presumes that the deed was the result of undue influence growing out of the relation of the defendant to her father as his housekeeper, companion and nurse, and her ministration to his health, wants and comfort, and the great influence over him that would naturally flow from such relation. We cannot have the benefit of her relation of these things, because the tongue of the one other person who knows them in all their details is silenced by

Undue Influence: Filial Relation.

death; but it is disclosed in evidence that the young mother did not come into his household as a mendicant, but that she brought property with her which she contributed to the general fund. We know something of the burden she sustained during the sickness of her father from the fact that when it broke her down, and her sister-in-law undertook to take it up, she could not endure the strain.

We are glad that the law does not look upon the faithful performance of filial duties of this character as an element of fraud. Nor does it lay its restraining hand upon the substantial recognition of these affectionate services. [Huffman v. Huffman, 217 Mo. 182, 193; Bonsal v. Randall, 192 Mo. 525, 532; Hamilton v. Armstrong, 120 Mo. 597; Turner v. Butler, 253 Mo. 202.] While it looks with disfavor upon the improper use of influence so acquired, there is no evidence in this case that Mrs. Hennegar attempted to influence her father in this respect. No word of hers upon the subject is mentioned in evidence other than the natural and impatient answer to her brother who was expressing to her father his dissatisfaction at the direction he had received with reference to this deed; and that included no solicitation or argument in her own behalf. We are satisfied with the finding and judgment of the trial court upon these questions.

III. We do not want to be understood as deciding or considering any question that might arise with reference to the absence from this suit of parties who represented George Creason by inheritance with respect to this deed. No point is made upon it in the record or argument, and its examination is not necessary to the decision of the case upon the broader ground we have taken.

In accordance with the foregoing view the judgment of the Greene Circuit Court is affirmed.

· PER CURIAM.—The foregoing opinion of Brown, C., is adopted as the opinion of the court. All concur, Bond, J., in result.