## SYLVIA F. FENTON et al. v. CHAS. F. FENTON et al., Appellants.

**Division Two, July 14, 1914.**

**DEED: Delivery: To Third Person for Record: Voluntary Family Settlement.**  A mother, by way of voluntary family settlement, made separate deeds to her two children and to her grandchildren, covering in the aggregate all of her real estate.  She delivered the three deeds to her son Fred with instructions to record them.  He recorded his own, and that of his brother was afterward recorded, but that to the grandchildren he returned to the grantor, in whose trunk it was found at her death ten years later.  *Held,* a good delivery of the deed to the grandchildren, and, this being a case of family settlement, and the grandchildren having been minors at the time of the delivery, their acceptance is presumed, and the title passed to them.

Appeal from Bates Circuit Court.—*Hon. C. A. Calvird,* Judge.

AFFIRMED.

*Smith & Chastain* for appellants.

The evidence in this case does not show that the deed to the plaintiffs was ever delivered.  The attorney who presented it and before whom it was acknowledged, who was introduced by the plaintiff, testified that after the acknowledgment he returned it to the grantor.  The evidence is undisputed that she delivered the three deeds in question to her son, Fred, to be kept for her in his safe, until she called for them.  The plaintiffs' own evidence shows that she afterwards did take this deed out of the possession of her son, Fred, and that it remained in her possession and under her exclusive control until the time of her death.  These facts, even if it be conceded that she made some statements during her lifetime indicating that she

thought the deed had become effectual, do not show a delivery, especially in view of the advice which her attorney, Smith, gave her at the time the deeds were written, to the effect that if the deeds were destroyed at any time prior to her death without having been recorded no estate would pass. Mudd v. Dillon, 166 Mo. 119; McNear v. Williamson, 166 Mo. 358; Bunn v. Stewart, 183 Mo. 375; Rausch v. Michel, 192 Mo. 293; Chambers v. Chambers, 227 Mo. 282; Huey v. Huey, 65 Mo. 689; Griffin v. McIntosh, 176 Mo. 392; Terry v. Glover, 235 Mo. 550.

*W. O. Jackson* and *Silvers & Dawson* for respondents.

The law presumes much more in favor of the delivery of deed in the case of voluntary settlements, especially when made to infants, than it does in ordinary cases of bargain and sale. Crowder v. Searcy, 103 Mo. 118; Bryan v. Wash, 2 Gilm. 568. The rule in this State has been settled by the decision that when a deed to a minor from his father is absolute in form and for his benefit and the grantor voluntarily hands the same to the third person telling him to have it recorded, it amounts to a delivery. Crowder v. Searcy, 103 Mo. 118; Togan v. Bass, 85 Mo. 654; Seibel v. Higham, 216 Mo. 131. Delivery has been held good, though the grantor retained possession of the document, manual delivery not being necessary. Sneathen v. Sneathen, 104 Mo. 210; Newton v. Bealer, 41 Iowa, 334; Shanklin v. McCracken, 151 Mo. 587. In this case, the execution of the three deeds was one transaction, as in Crowder v. Searcy, 103 Mo. 119.

ROY, C.—This is a controversy over seventy-two acres of land. The petition is in three counts. The first count alleges that Mary J. Fenton on October 31, 1901, conveyed to the defendant George W. Fenton,

seventy-nine acres of land, to defendant Charles F. (Fred) Fenton, seventy-eight and a half acres, and to the plaintiffs seventy-two acres, all particularly described in the petition, she being the owner at the time of the conveyances and reserving a life estate in said land by the terms of said deeds. The petition alleges that the four plaintiffs were all minors at the date of said deeds; that the deed so made to plaintiffs was delivered to the defendants for the use and benefit of plaintiffs and was, at the institution of the suit, in the possession and control of the defendants, and had never been recorded. That said George W. and Charles F. Fenton and these plaintiffs are the sole heirs of said Mary J. Fenton, who died in January, 1911. That plaintiffs are the owners in fee of the seventy-two acre tract. The petition then prays that the defendants be directed to deliver to the plaintiffs the deed so made to them, and that defendants be divested of all apparent title to said land and that the same be vested in plaintiffs. Then follows a prayer that said land be partitioned and sold and the proceeds be distributed among the plaintiffs.

The second count is for partition of the same land and seeks to charge the defendants Charles F. and George W. Fenton with advancements equal to their share of the land in controversy.

The third count is for the purpose of quieting the title against the heirs and legal representatives of a former owner of the land. These defendants made default and judgment went against them.

At the date of the deeds the grantor, Mary F. Fenton, was an aged widow, with two sons, the defendants George W. and Charles F. (Fred) Fenton. These four plaintiffs are the children of her deceased son, Philip C. Fenton. She was living in the house on the tract in controversy. That tract was to some extent less valuable than each of the other two tracts mentioned. She went before Mr. Smith, as her lawyer,

and had the three deeds prepared. She signed and acknowledged them and took them home with her. Shortly afterward she handed them to her son Fred. Concerning that transaction Fred testified as follows:

"I recall the circumstance of mother turning over to me a deed to the seventy-two acres in question; I think this was in 1902 and was at her home. I was at her house on a visit. She asked me to come and go in the bedroom with her. I went in there and she gave me these three papers. She says, 'You have a safe at the store, haven't you?' I says, 'Yes, ma'am.' She says, 'You put them in your safe and keep them until I tell you what to do with them; keep them there for same keeping,' she says. I done exactly what mother told me to do—put them in my safe in my store, and they were never touched from the time she gave them to me until the time she called for them, which was something like a year after that. I asked her what the papers were when she gave them to me and she says, 'You can read them as you go home and see.' She afterwards called for these deeds at my house. I took them out of the safe and handed them together to her just as she gave them to me to keep for safe keeping. She handed me my deed back and says, 'Fred, here is your deed; you can do as you please with it,' and she told me to tell George to do as he pleased with his, that he could have his, and she gave back to me George's deed. She did not give back to me the deed to the land in controversy, but took it with her. I have never had possession of that deed from that day until this, and, furthermore, since the time of the conversation she made to me at the time she asked for the deeds back, she says, 'This deed I am going to change'—that was the deed for the seventy-two acres. She said, 'If you will be the administrator for these heirs I can fix it up some way at their death it will go back to the Fenton estate; I will do that; but otherwise they cannot have it.' I said 'Do just

as you please, ma, about it,' but I told her I wouldn't under any circumstances be their administrator. She says, 'Then they will not get it.' By George's instruction I sent George's deed to W. W. Graves for record. I sent it through the mail. I do not remember whether he sent it back to me or to George.''

George W. Fenton testified as to the deed to plaintiffs, as follows:

''I went with my mother to Adrian at the time she signed and acknowledged the deed to the plaintiffs before A. J. Smith. She afterward told me she had given this deed to Fred to keep for her until she called for it. I do not know the exact date when it was returned to her, but I guess from what she told me it was something like a year and a half later. I afterwards saw this deed among some of her other papers in the drawer of her dresser in her house. It remained there in the house five or six years. She and I cleaned out the dresser drawer, as the mice had eaten up part of the papers there, and I, by her instruction, put it in a trunk that she bought from Pete Alexander. This deed remained there in the trunk during her life and until after her death. I never had the custody or possession of that deed. During her lifetime my mother, on different occasions, remarked that she thought the children didn't treat her right; that they didn't care nothing for her, only for what she had, and they wasn't going to get it.''

The deed to Fred was recorded February 3, 1903, and the one to George on February 7, 1903.

At the time of the execution of these deeds and for three or four years afterward, James C. Fenton and his wife lived in the same house with the grantor. He was her step-son, and the half-brother of her children. Mrs. James C. Fenton testified that the grantor told her that she had given all the deeds to Fred to be recorded, but that he only had his own recorded, and that she didn't know it until George came; that

George saw in the paper that Fred's deed had been recorded, and came to his mother to see why Fred's deed only had been recorded, and that the grantor had told George that she thought Fred would have them all recorded, and that he could have his deed recorded. James C. Fenton testified as follows:

"Emily Fenton, Phil's widow, came to the house quite frequently, and so did the other brother, George, and it seems that ma had turned the deeds over to Fred to have them all recorded, that was the impression I got from their talk, and from the way the thing was done; Fred had his recorded and return the other two. After George discovered that his deed had not been recorded he came to see about it, and she went to Fred and got the deeds back and turned them over to George and George had his recorded and didn't have the third one recorded. So Emily then came to inquire in the interest of her children, came to grandma, and ma talked to my wife and me frequently about it, and to me especially. . . . Emily would come right down after ma once or twice a month, possibly, and she would say, 'I am feeling bad and Emma disturbs and worries me about that old paper, and I wish she didn't talk to me about it. I have fixed it to suit myself, and I am going to have those children, Phil's children, safe.' She says, 'I know Phil's children haven't their share and there won't be any trouble about it, and I assured Emma of that.' She refused to turn the deed over to Emma; I supposed she had it. She said, 'I will have it attended to; I will turn it over to you.' The deed was evidently in the house. George was there most of the time himself. I heard these conversations with Emma after George's and Fred's deeds had been recorded, and she assured her every way she could that she would have it done right and that she wasn't going to turn it over to her now. She said, 'I haven't got any too much confidence in the Powells. She is a young widow and might marry again and those

children be beat out of it.' She told me she had taken the children's deed away from Fred and she was going to have it attended to by someone else. These conversations were while I was living there, since which time I know nothing about the matter.''

The deed to plaintiffs, after the grantor's death, was found in her trunk at her home. She left a will executed December 10, 1910, in which she gave the plaintiffs a dollar each, and gave all the residue of her personal property to the two sons. The will made no mention of real estate.

The grantor delivered all the deeds to Fred. He testified that they were to be kept by him for her. He stands alone in that statement. The **Deed: Delivery: To Third Person for Record.** facts show the contrary. James C. Fenton and his wife, inmates of the mother's home, testified that she stated that the deeds were delivered to Fred for record. Fred did put his on record. Such fact was published in the papers. As a result George went to see his mother about it and his deed was sent to record. Later on the mother of the plaintiffs became importunate about the deed to them. The grantor had talks with Fred in which the subject was discussed as to changing the deed so that at the death of the plaintiffs the land would go back to the Fenton estate. We need not conclude that Fred was responsible for a change in the mind of the grantor, if there was a change. It is sufficient to say that a great preponderance of the evidence shows that the grantor delivered all these deeds to Fred to be by him placed on record. As late as 1910, she made her will which shows that she was unconscious of having any real estate to dispose of. Even if she did undergo a change of mind after delivering the deeds to Fred for record, and did get possession of the deed and refuse to deliver it to the mother of plaintiffs or to put it on record, that fact does not

destroy the legal effect of the previous delivery to Fred for record.

In Crowder v. Searcy, 103 Mo. l. c. 118, it was held that the law presumes much more in the case of voluntary settlement, especially when made to infants, than it does in ordinary cases of bargain and sale. In that case the grantor signed and acknowledged a deed to his grandchildren and handed it to a third party to be recorded and gave him the money for that purpose. The court said: "When he did this, we hold that the first deed was fully delivered and the title passed to the defendants, even though there was a misdescription. A court of equity would have corrected the description. Equity regards that as done which ought to be done."

The fact that the grantor gave the third party the money to record the deed does not make any difference. When Mrs. Fenton handed the deeds to Fred to be recorded, if she did not furnish him with the money to pay for recording them, his acceptance of the duty was equivalent to an undertaking to have them recorded.

In Standiford v. Standiford, 97 Mo. l. c. 239, it was held that each case must stand on its own peculiar facts, the court saying: "It is sufficient, if, after the grantor has signed, sealed and acknowledged the deed, he makes some disposition of it from which it clearly appears that he intended that the instrument should take effect as a conveyance and pass the title."

Acceptance: Voluntary Settlement. This being a case of family settlement, and the grantees being minors at the time, their acceptance of the deed will be presumed.

In our opinion the judgment and decree entered on the first count disposes of the controversy in the second count, and the judgment is in all particulars affirmed. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All the judges concur.