Canty v. Halpin.

---

## JOSEPH CANTY et al. v. CATHERINE HALPIN et al., Appellants.

In Banc, May 22, 1922.

1. **CANCELLATION OF DEED: Pleading: Cause of Action: No Possession.** Under the statute (Sec. 1970, R. S. 1919) expanding the old equitable principles, plaintiffs may maintain a suit in equity for the cancellation of deeds without being in possession, and their petition may allege a cause of action to cancel the deeds although it does not state they are in possession.

2. ———: ———: **Equitable Jurisdiction: By Prayer.** A prayer for relief in a petition for the cancellation of deeds upon the grounds of the incapacity of the grantor and of undue influence exercised over her mind is sufficient to bring the action within the equitable doctrines embraced in the statute (Sec. 1970, R. S. 1919), and a court having once acquired jurisdiction for one purpose will proceed to do complete justice between the parties and determine all matters at issue.

3. ———: **Delivery.** Delivery is sufficient if after the deeds were signed, sealed and acknowledged, some disposition was made of them from which it clearly appears that it was the grantor's intention that they should take effect as conveyances and pass the title.

Canty v. Halpin.

4. ———: **Allegation of No Delivery: Proof: Right to Recover.** Notwithstanding plaintiffs allege that the deeds were never delivered, and the proof establishes their delivery, the plaintiffs make a prima-facie case for the cancellation of their mother's voluntary deeds to her other daughters if they prove that she was unduly influenced in their execution or that she was incapable of making them.

5. ———: **Undue Influence: Confidential Relation.** Testimony which goes no further than to show that a grantee in her widowed mother's voluntary deeds aided her in the management of her affairs and that this aid consisted in answering the telephone, looking after repairs on her property and preparing checks for her to sign, is not sufficient to establish a confidential or fiduciary relation between the mother and said grantee, and hence the law will not presume undue influence or cast the burden on the grantees to show there was no undue influence.

6. ———: ———: **Verdict of Jury in Will Case: Presumption.** In a suit in equity to cancel voluntary deeds conveying lands which had previously been devised to a daughter who had died after grantor's will was executed, even if it be conceded that the verdict of a jury annulling the will on the ground of undue influence exercised by the grantee over the mind of the testatrix is to be considered as establishing a presumption that the subsequent deeds were the result of the same undue influence, and if it be further conceded that a status once established is presumed to continue and remain predominant, the presumption is only such as will sustain the burden of evidence until conflicting facts on the point appear, and when they do appear the presumption vanishes and drops out of sight.

7. ———: ———: ———: **Res Adjudicata: Incompetent Evidence.** In a suit in equity to cancel voluntary deeds on the ground of undue influence exercised by the grantees over the mind of the grantor, the record of an action at law, by which the validity of the grantor's prior will was brought into contest and in which a jury had returned a verdict finding that the will was the result of the undue influence of the same grantees, is not admissible in evidence. The will contest was not a proceeding *inter partes*, but one *in rem*, and therefore the verdict of the jury therein is no evidence that the deeds were procured by the undue influence of the grantees.

8. ———: **Incompetent Evidence.** The admission of incompetent evidence in an equity suit is not ground for reversing the judgment, for the reason that on appeal such a suit is triable *de novo* and the court will exclude from its consideration any inadmissible evidence appearing in the record,

9. ———: **No Evidence.** In this case, which is a suit in equity to cancel certain voluntary deeds made by a mother to her unmarried daughters, based on the ground that they were executed under the undue influence and compulsion of one of said daughters over the mind of their mother, *Held*, that the finding of the trial chancellor that there was such undue influence is not only against the weight of the evidence, but is not supported by any evidence at all, and the case is remanded with directions to dismiss plaintiffs' bill.

Appeal from St. Louis City Circuit Court.—*Hon. George H. Shields*, Judge.

REVERSED AND REMANDED (*with directions*).

*Marshall & Henderson* for appellant.

(1)  The petition alleges that the deeds were never delivered to defendants. The answer denies this. The plaintiffs introduced no evidence whatever that the deeds were not delivered, but relied upon the proposition that the burden of proof was on defendants to show delivery, basing that contention on the ground that the defendants knew and the plaintiffs did not know whether or not they had been delivered. A deed must be delivered to become effective. The plaintiffs themselves make out a sufficient prima-facie case that the deeds were delivered to the defendants. (2)  The grantor was the mother of the defendants. The property conveyed was a gift. The consideration was love and affection. Nothing more was necessary. (3)  There is no substantial evidence of incompetency in the case. (4)  The plaintiffs failed absolutely to show a single instance of the undue influence of the defendants over their mother. They admitted that they could not specify a single act of undue influence. They say, however, that undue influence is of such a sinister character that it cannot be proved by direct evidence, but may be shown by circumstances. The circumstances they rely on are: (a)  That Julia wrote the body of the checks, which her mother signed to pay bills; (b)  that Julia made out the deposit tickets and deposited the money in the bank for her mother; (c)  that

when complaints from tenants about repairs came in, Julia answered the phone, and after consulting her mother gave orders what to do. This is the sum of Julia's undue influence as shown by the evidence. The evidence also shows that when Julia was in Denver with Isabel for ten months, and when Julia was in the hospital for three weeks, and when Julia was not in the house, Kate or Isabel did the same things for their mother. It is too absurd to admit of serious argument that any of these matters, or all of them combined, are any evidence whatever of undue influence. Thompson v. Ish, 99 Mo. 182; Brinkman v. Rueggestick, 71 Mo. 553; Jackson v. Harbin, 83 Mo. 78; Meyers v. Hauger, 98 Mo. 433; Doherty v. Gilmore, 136 Mo. 414; McFadden v. Catron, 138 Mo. 218; Berberet v. Berberet, 131 Mo. 410; Cash v. Lust, 142 Mo. 630; Riley v. Sherwood, 144 Mo. 366; Defoe v. Defoe, 144 Mo. 458; Aylward v. Briggs, 145 Mo. 604; Sehr v. Lindemann, 153 Mo. 276; Tibbe v. Kamp, 154 Mo. 545; Gordon v. Burris, 153 Mo. 223; Martin v. Bowden, 158 Mo. 352; Wood v. Carpenter, 166 Mo. 465; Fitzpatrick v. Weber, 168 Mo. 562; Hayes v. Hayes, 242 Mo. 169; Winn v. Grier, 217 Mo. 459; Teckenbrock v. McLaughlin, 209 Mo. 533; Maddox v. Maddox, 114 Mo. 46; Sanford v. Holland, 276 Mo. 470; Spurr v. Spurr, 226 S. W. 39; Hern v. Dysart, 220 S. W. 910; Land v. Adams, 229 S. W. 158. The undue influence must be actually exercised at the time the will or deed was executed. Brinkman v. Rueggestick, 71 Mo. 553. The law looks with great favor upon the performance of filial duties. Turner v. Butler, 233 Mo. 202; Goodman v. Griffith, 238 Mo. 706; Land v. Adams, 229 S. W. 158. An advantage by gifts obtained solely through loving sacrifices and devoted service of a child to her mother do not constitute undue influence. Andrews v. Linebaugh, 260 Mo. 623; Hayes v. Hayes, 242 Mo. 155. The fact that a parent does not divide his property equally among his children does not show undue influence, nor is it any proof of a confidential relation. Fitzgerald v. Weber, 168 Mo. 562; McFarland v. Brown,

193 S. W. 800; Bennett v. Ward, 272 Mo. 671. (5) Mr. and Mrs. Dempsey were both competent witnesses. A communication between an attorney and a client is not confidential when a third person, who is not interested, is present, and both the attorney and the third person are competent witnesses in the case. Mrs. Dempsey had no connection whatever with her husband's business, and was as much a third person as a stranger would have been. She was present at the direction of Mrs. Halpin, and this breaks the seal of secrecy between an attorney and client. 40 Cyc. 2377; Tyler v. Hall, 106 Mo. 313; Weinstein v. Reid, 25 Mo. App. 41; Goddard v. Gardner, 28 Conn. 172; State v. Perry, 4 Idaho, 224; Hoy v. Morris, 79 Mass. 719; Walker v. State, 19 Tex. App. 176; Kissack v. Burke, 132 Ill. App. 360; Champion v. McCarthy, 28 Ill. 87; Thompson v. Cashman, 181 Mass. 26; Jackson v. French, 2 Wendell, 337; Blount v. Kimpton, 155 Mass. 251; Mueller v. Batcheller, 131 Iowa, 650; DeWolf v. Strader, 25 Ill. 225; Smith v. Long, 106 Ill. 485; Mobile Railroad v. Yeates, 67 Ala. 164; Matter of Eckler, 126 N. Y. 204; Martin v. Smith, 44 S. W. 683. (6) Plaintiff's petition does not state facts sufficient to constitute a cause of action against defendants. This is a proceeding in equity by plaintiffs claiming, in their petition, the legal title to land, and, being out of possession, to remove a cloud on such title. It is settled law in this State that this cannot be done. Davis v. Sloan, 95 Mo. 553; Graves v. Ewart, 99 Mo. 18; Keane v. Kyne, 66 Mo. 216; Sneathen v. Sneathen, 104 Mo. 206; McRee v. Gardner, 131 Mo. 606; Mason v. Black, 87 Mo. 329. (7) The court erred in admitting the record of the will contest and instructions of the court for the purpose of showing that it was "*res adjudicata*" on the questions of undue influence in procuring these deeds in this case, and that a confidential relation existed in January, 1914, and would be presumed to continue and be present on November 30, 1917.

*Glendy B. Arnold* for respondent.

(1)   Fraud in procuring deeds is presumed from
the existence of a fiduciary relationship between grantor
and grantee.   McClure v. Lewis, 72 Mo..314; Leavitt v.
LaForce, 71 Mo. 353; Martin v. Baker, 135 Mo. 495;
Cadwallader v. West, 48 Mo. 483, 494; Dingman v.
Romine, 141 Mo. 466; Cornet v. Cornet, 248 Mo. 184,
234; Ryan v. Ryan, 174 Mo. 279; Jones v. Belshe, 238
Mo. 524.   (2)   Where the right to equitable relief is
shown to turn upon the credibility of the witnesses, this
court will defer to the judgment of the trial court, and
where there is evidence to sustain the decree it will be
affirmed.   Sinnett v. iSnnett, 201 S. W. 887.   (3) Kate's
deeds are tarred with the same stick that spoils Julia's.
"A court of equity will set a deed aside for undue in-
fluence exercised over the grantor by a third person, the
same as if it were exercised by the beneficiary in the
deed.   The latter takes its subject to the taint of im-
proper influence."   Ranken v. Patton, 65 Mo. 378; Miller
v. Simonds, 72 Mo. 669, 687.   (4)   The deeds themselves
raise the presumption that they were obtained by fraud.
Martin v. Baker, 135 Mo. 495, 504.   (5) To make a deed
effectual it must be delivered to the grantee or to some
one for him, so that it has passed out of the control of
the grantor.   Peters v. Burkemeier, 184 Mo. 393.   (6)
Signing, acknowledging and recording of a deed does
not prove delivery.   Peters v. Burkmeier, 184 Mo. 393.
(7)   A confidential relationship between Mrs. Halpin
and the defendants having been established, the burden
is upon them to prove a delivery of the deeds.   Cases
under Point 1.   (8)   Knowledge of delivery being shown
in this case to have been exclusively in the possession of
the defendants, the burden was on them to prove the
negative averment in the bill that the deeds were not de-
livered.   Fulweider v. Gas Company, 216 Mo. 582;
Swinhart v. Railroad, 207 Mo. 434.   (9)   The verdict and
judgment in the will case were final, though an appeal

was pending, and the record in that case is available as evidence in the present case to establish, at the time the will was made, the possession of undue influence by Julia Halpin over her mother, the existence of a fiduciary relationship and a design to cheat and defraud the plaintiffs of their patrimony. R. S. 1919, sec. 526; Rodney v. Gibbs, 184 Mo. 1; Vantine v. Butler, 250 Mo. 445; State ex rel. v. Center Creek Mining Co., 262 Mo. 440. (10) The invalidity of the will turned upon a decision of the issue of undue influence. ''A proposition assumed or decided by the court to be true, and which must be so assumed or decided in order to establish another proposition which expresses the conclusion of the court, is as effectually passed upon and settled in that court as the very matter directly decided.'' Chouteau v. Gibson, 76 Mo. 38, 47. (11) Identity of subject-matter is not essential unless the former judgment is offered as a bar. ''A point which was actually and directly in issue in a former suit, and was there judicially passed upon and determined by a domestic court of competent jurisdiction, cannot be again drawn in question in any future action between the same parties or their privies, whether the causes in the two suits were the same or not.'' Roth Tool Co. v. Spring Co., 146 Mo. App. 1. (12) When a status or a design is once shown to exist, the law presumes that it continues until the contrary is made manifest by proof. Nelson v. Jones, 245 Mo. 579, 591; 1 Wigmore on Evidence, sec. 102. (13) There was no error in admitting in evidence the record in the will case, because the defendants set up that record in their amended answer as matter of defense. (14) There was no error in permitting Mary Canty and Jennie Boeckmann to testify that their mother told them that if they would make her a deed to John's property she would see that they got their share of her estate at her death. Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo. 160; Bush v. Bush, 87 Mo. 480; Crowson v. Crowson, 172 Mo. 691. The court below had jurisdiction to cancel the deeds in question. Peters v. Berkemeier, 184 Mo. 393.

REEVES, C.—This is a companion case of another just decided, that case being styled Joseph Canty et al., Respondents, v. Julia Halpin et al., Appellants. The latter case was a statutory action to set aside the will of Margaret E. Halpin on the grounds of undue influence exercised over her mind by Julia Halpin, one of the appellants therein and herein.

. This is an action in equity to cancel eight deeds, dated November 30, 1917, signed and acknowledged by Margaret E. Halpin, and conveying four separate pieces of property to appellant Julia Halpin, and conveying four separate pieces of property to appellant Catherine Halpin, all upon the grounds of incapacity and undue influence. Plaintiffs prevailed below.

Respondents Mary Canty and Jennie Boeckmann, with the appellants, are the only surviving children of Margaret E. Halpin, deceased. Respondents Joseph Canty and Martin Boeckmann are husbands respectively of Mary Canty and Jennie Boeckmann. There are no other heirs of Margaret E. Halpin. Margaret E. Halpin died on the 22nd day of July, 1919, and this suit was instituted in the Circuit Court of the City of St. Louis on August 11, 1919.

Appellants are the unmarried daughters of the grantor and resided with her until her death. The petition charges that the grantor was of the advanced age of seventy-one years; was weak and infirm; at the time the deeds in question were executed, was suffering from great mental anguish and sorrow by reason of the death of one of her children; that she was mentally and physically incapable of looking after her affairs and depended on others; that appellant Julia Halpin was of a domineering and determined disposition, and had acquired an undue influence over the mind of the grantor and that by over-persuasion and dictation had procured the execution of said deeds; that a confidential relation had been established between grantor and Julia Halpin by reason of the position of said Julia Halpin, as manager

of the business affairs of the grantor; and that the grantor, for a valuable consideration, had promised the respondents to make an equal division of her property among her children.

The answer of the appellants denied the principal allegations of the petition, alleging that the grantor had conveyed certain properties to the respondents previous to the execution of the deeds in question, and that by the terms of a will, dated January 22, 1914, all of the parties hereto had enjoyed benefits; that said will had been contested and set aside, but that from the judgment an appeal had been taken, and then there was a prayer that the action of the court in the contest case should be without prejudice to the rights of the appellants in the event the will should be finally upheld.

The testimony in this case differed widely from that produced in the will contest. In that case there was *some* testimony that Julia Halpin had exercised an undue influence over the mind of the testatrix, and it appeared that she occupied such a position with respect to her mother's affairs as to show a confidential and fiduciary relation and, therefore, raised the presumption of undue influence. The will contest case, being a statutory action and therefore an action at law, we held that there was substantial testimony offered by contestants to call for the opinion of the jury, although there was an abundance of testimony in contradiction to plaintiffs' case. In this case respondents offered in evidence the petition, the record proper and the instructions of the will contest for the purpose of showing a status at the date of the execution of the will, to-wit, January 22, 1914, as determined by the judgment in that case, which status was that Julia Halpin had an undue influence over the mind of the testatrix and had exercised that undue influence over testatrix on that date.

Mary Canty, one of the respondents, then testified in substance that she was married in 1902 and since that time had lived away from the home of the grantor, although she visited her mother frequently, "nearly always

once a week'' that her mother had lived for nearly thirty-five or forty years at 2211 University Street in the city of St. Louis where she died; that one of her sisters, named Isabel, had died on the 22nd of November, 1917, and that she being the youngest child, her mother was never the same; that her mother was feeble and had to get around with a cane, and that she was seventy-one years old when she died; that Isabel was buried on Friday, and that her mother and Julia and Kate, the appellants, on the Sunday following came to her house, where they stayed for some time; that on the following Friday, one week from the burial of Isabel, the mother and Julia and Kate returned home; that witness took her mother home in a machine, got there about three o'clock; that her mother started to cry, whereupon Julia said that she should not get herself worked up as she had some insurance papers to sign; that after a little while her mother went over to the desk, and Julia gave her some papers, ''a whole bunch of papers, and mother kept signing them as Julia handed them to her. They looked like deeds or insurance papers; at the time we thought they were insurance papers. I did not know what they were. When mother finished signing them Julia took them and went down town.'' ·Witness further said that ''Julia used to help mother manage her business;'' that on August 5, 1918, witness, with other children of grantor, attended a birthday party at her mother's home, and at that time was told that her mother was going to give each of her daughters a piece of property; that same was done, the deeds recorded, and that witness had been in possession of property given to her. It should be said that, as alleged in the petition, for the purpose of doing equity this property was tendered back, and the same was done with respect to the property given to respondent Jennie Boeckmann.

Witness spent much time with her mother; she visiting her mother and her mother visiting her. She took her out driving in her automobile. Her mother never

asked her to help her in business matters, as "Julia did not allow anybody to help mother."

Witness said that prior to November 30, 1917, Julia was in Denver for about ten months taking care of Isabel, who died on November 22, 1917, and that during her absence "Kate attended to everything" and that "Kate took care of the business while Julia was gone." She said that for a year before the death of her mother she, her mother, did not attend to her affairs (her death occurred July 22, 1919, and the deeds were executed November 30, 1917), and she testified further that she, the witness, never paid any attention to her mother's business; that Julia attended to everything for three or four years before her mother's death; that Julia gave out the work and went to see that it was done, referring to plastering, plumbing and repairs, and that Julia wrote out checks and that this was about all the business to be attended to; that "Julia attended to the details of mother's affairs by answering the phone, making out checks, taking money to the bank."

Jennie Boeckmann testified for respondents, in substance, that after her marriage in 1902 "Julia took charge of father's business and has been handling it ever since father died in 1906." "After father's death Julia assisted mother in looking after the property, rents, etc., and did the banking business. She did the banking business when father was alive." Witness did not learn of the conveyances of November 30, 1917, until informed of the fact in the spring before her mother's death; that while Julia was away Kate attended to the business with the assistance of Genevieve, witness's daughter, and that her mother had an agent to collect her rents and look after the repairs; that her mother had an agent to take care of her business, when Julia was at home, as well as when Julia was away, but that when Julia was away he looked after the repairs. Several specific and important transactions carried on by grantor were called to her attention, but witness was unable to say whether or not Julia had any connections with such transactions.

In fact, she said she had no knowledge of any instances where Julia had anything to do with any business of importance in the affairs of her mother, such as borrowing money and selling property.

Witness testified as to disagreements and controversies between Julia and herself and other members of the family.

Lawrence Tracey, testifying for respondents, said, in substance, that he knew Mrs. Halpin, the grantor; that he never knew her to attend to any business during the life of her husband, and that since his death he did not know who attended to the business.

Genevieve Boeckmann, the seventeen-year-old daughter of Jennie Boeckmann, testifying for respondents, said, in substance, that prior to November 30, 1917, she practically lived at her grandmother's house; that "Julia managed all of her business affairs," but upon inquiry as to details said that she wrote out checks, answered the telephone and looked after repairs on houses owned by her grandmother; that she would write out checks to pay household bills. She remembered that her grandmother bought an automobile, and that she sold it again, and that in signing checks Julia would show her grandmother where to sign. This was all the testimony on the part of the respondents.

On behalf of appellants John B. Dempsey testified substantially that he acted as attorney for the grantor; that he was well acquainted with her and with her business; that she was a capable, sensible and intelligent woman, and that she was thoroughly conversant with all her property and business interests, and talked intelligently upon them at all times. Witness considered her a smart woman.

Witness and wife were at the home of grantor the night after Isabel died. Witness and his wife, and Mrs. Halpin, were alone. Mrs. Halpin inquired if, in view of Isabel's death, it would be necessary to make a new will. Witness asked her "what disposition she wanted to make of the property that would have gone to Isabel.

She told me she wanted to give that to her children without waiting for the operation of her will. I then told her that all that would be necessary would be for her to make deeds to them. She then told me in detail from memory what property she wanted to give to Jennie, Mary, Julia, etc., and I made a memoranda of it. She gave me the exact pieces and numbers of the houses. I was familiar with the property, and had the original deeds in my office, and all I needed was that much of the description to make my memorandum. She said what she wanted to give to Julia, and what to Kate, and said that was all she wanted to do at present, and asked me to prepare deeds for her. I asked her what she wanted to do with Mary and Jennie, and she said, 'I'll call you later on that. I don't want to do anything on them just now, but I want these deeds made and brought to me when they are finished.' I made the memorandum and drew the deeds. The next morning I went to see Mrs. Halpin again. It was the morning of the funeral, but I had no conversation with her at that time. I drew the deeds, and on the following Wednesday, if I recollect right, it was before Thanksgiving Day, I got a call that Mrs. Halpin would be home Thanksgiving Day and I should give her the deeds. I don't know who put in the call. I then remembered that the next day was Thanksgiving, and I said I would come out Friday morning, which I did. There was no one present when I saw Mrs. Halpin that time. I handed the deeds to Mrs. Halpin, and she looked them over, and read them."

The plaintiffs objected to this statement, and the court ruled that it would exclude the deeds unless other persons were present.

Witness then stated that, "I was not there as a lawyer." The court then sustained the objection to that statement.

Witness then stated that on that occasion he acted as a notary public.

Counsel for plaintiffs then objected to the statement of the witness, and the court sustained the objection.

Witness then stated that the deeds were there at the time; that he had no personal knowledge of who had them recorded. "At that time Mrs. Halpin was in good health for a woman of her age. She had difficulty in getting around and did not walk freely, but she was in good average health. On the occasion of my first visit, when my wife was with me, neither Julia nor Kate had anything to do with the business I was transacting with Mrs. Halpin."

Dr. Arthur Gundlach, testifying for appellants, said in substance that he visited Mrs. Halpin professionally in 1917 and 1918; that he was the family physician; that she was then suffering from arterio sclerosis, high blood pressure and varicose veins, but that her mind was clear; that he had frequent conversations with Mrs. Halpin, and she had a clear understanding of all matters under discussion.

On cross-examination he said that he judged Mrs. Halpin was the head of the family, but that Julia appeared to be the head of the family. He explained the latter statement by saying that Mrs. Halpin always told him to send his bills, and that Julia would send him a check, but that when the checks came they were always signed by Mrs. Halpin. Witness said he never observed that Julia did anything in the way of managing her mother's business.

. Mrs. Virginia Dempsey, testifying for appellants, substantially supported her husband's testimony; said that Mrs. Halpin had told her husband in the presence of witness that "she wanted to provide for her single girls," and on cross-examination she quoted Mrs. Halpin as saying that "she wanted to provide for Julia and Kate, her single daughters;" that her two married daughters were settled, and for that reason she wanted to provide for Julia and Kate. Witness further said that every time she was there grantor expressed anxiety for her single girls.

C. P. Heath, a real estate agent, testifying for appellants, in substance, said that he transacted business for

Mrs. Halpin; that he sold a flat for her in 1919; that his conversations were with Julia until he finally secured a purchaser; that in January or February, 1919, he went out to see Mrs. Halpin and went over the details of the transaction with her and Julia. Mrs. Halpin signed the deed, and witness took her acknowledgment as notary. She could see what she was signing, but had some difficulty in keeping on the line; that she understood all that was said in the conversation, and witness considered her perfectly rational. Mrs. Halpin at the conclusion of the transaction told witness to sell her property at 12th & Chambers Street.

Charles J. Henneken, testifying for appellants, in substance, said that he was in the real estate business with Henry Andreas Company and had been for eighteen years; that he handled Mrs. Halpin's rent collections in her lifetime and up to July 19, 1919; that when repairs were to be made his firm notified Mrs. Halpin, and that she had them made; that rent checks were sent to Mrs. Halpin; that on one occasion she called at his office and took him out to Grand Avenue, where she wanted witness to look after the prorating of rents, insurance, water license and taxes on property she purchased through other agents; that she seemed to act intelligently and to understand what was going on; that some time after 1914 witness called on Mrs. Halpin at her home in the matter of raising his agency commission, and that he talked with Mrs. Halpin who emphatically said, "No, that she would not stand for any increase."

Tim Barrett, testifying for appellants, in substance, said that he worked around the house—did chores for Mrs. Halpin after her husband's death, and as late as the summer of 1918; that he always dealt with Mrs. Halpin; that he did repair-work for her on her house; that she paid him herself when downstairs, and sometimes sent it down by some of the girls; that he talked with Mrs. Halpin frequently; that she talked just as intelligently in the summer of 1918 as she did in the previous years, and attended to her business in the same way.

M. J. Toomey, testifying for appellants, in substance, said that he knew Mrs. Halpin for seven or eight years before her death and did work for her—roofing houses and repairing roofs; that he made his contracts with Mrs. Halpin and dealt with her; that she always talked about the work she wanted done, and usually they agreed on the price; that she understood the business matters talked about, the price and quality of goods, and workmanship, etc.; that she always talked intelligently on those subjects; that there was no change in her mental capacity in the summer of 1918; that his contracts were always with Mrs. Halpin; that he sent his bills to her, and that she sent him checks signed by her.

John Miller, on behalf of appellants, testified in substance that he had business transactions with Mrs. Halpin prior to 1917; that he made his contracts direct with her, and was paid with checks signed by her; that he was a carpenter and built houses and made repairs for her; that when he talked with Mrs. Halpin there was always someone present, "Julia was there and sometimes Jennie," but that they participated very little in the conversation; that Julia did not consult with him about the work he did for her mother.

Charles Wickliffe, testifying for appellants, in substance, said that he was a carpenter and did work for Mrs. Halpin between 1906 and 1918; that he did repair-work; that he sent bills to Mrs. Halpin, and was paid by her; that Florence and Isabel made out several of the checks, but that Mrs. Halpin signed them; that Mrs. Halpin examined the bills herself and discussed them with witness.

Patrick O'Neill, testifying for appellants, said, in substance, that he was a landscape gardner and florist; that he worked for Mrs. Halpin, taking care of her lot in the cemetery; that she always ordered anything that she wanted done; that she was intelligent; that the last bill rendered to Mrs. Halpin was in 1919; that witness went to see Mrs. Halpin, and that she came down stairs, and that Kate was with her; that she questioned him

about different items, but paid it by check; that the check was- signed by Mrs. Halpin; that she told witness about splitting up some of her property, and that she had transferred some to all of her girls; that Mrs. Halpin was prejudiced against one of her sons-in-law, but not against her children.

P. J. Dooley, testifying for appellants, said in substance that he was a Catholic priest and knew Mrs. Halpin and her family; that after Isabel's death he noticed no impairment of her mental faculties; that she bore up remarkably well after Isabel's death, and that he never heard her speak of her married daughters, but that she spoke of her affection for the children who were at home.

Kate Halpin and Julia Halpin, appellants, were offered as witnesses, but upon objection their testimony was excluded. Respondents then offered some rebuttal testimony which we do not deem important to detail here.

I. In their assignments of error appellants complain that the trial court erred in overruling their motion in arrest of judgment. This motion was a challenge to the sufficiency of the petition, and was in the language of a general demurrer. They argue that the petition does not state a cause of action, because it is an action to cancel deeds on property; that the respondents claim the legal title, and not being in possession cannot maintain an equitable action. This contention must be ruled adversely to appellants, as the old equitable principles have been supplemented and expanded by the statutory remedies set forth in Section 1970, Revised Statutes 1919. [Capitain v. Trust Co., 177 S. W. 628, l. c. 632; Shanklin v. Boyce, 275 Mo. 5; Martin et ux. v. Jones, 228 S. W. 1051.]

II. And, moreover, the prayer for relief was sufficient to bring the action within the equitable doctrines arising under Section 1970, and the court having once

By Prayer. acquired jurisdiction for one purpose · will proceed to do complete justice between the parties and determine all matters in issue. [Waddle v. Frazier, 245 Mo. 391.]

III. It was alleged by plaintiffs that the deeds were never delivered, and appellants argue that it was shown by the testimony that such deeds were delivered, and that, therefore, plaintiffs' case failed. The testimony of Delivery. Mrs. Canty in connection with that of John B. Dempsey shows conclusively that the deeds were delivered. It is sufficient, if after the grantor signed, sealed and acknowledged the deeds, some disposition is made of them from which it clearly appears that it was the intention that the instruments should take effect as conveyances and pass title. All of this appeared from the testimony, [Felton v. Felton, 261 Mo. 202, l. c. 208, 209; Standiford v. Standiford, 97 Mo. 231, l. c. 239.]

IV. However, upon their petition, plaintiffs could still make a prima-facie case even if the deeds were in fact delivered if they could prove that the grantor was unduly influenced in the execution of said deeds, or that she was incapable, for in such case the deeds Recovery Nevertheless. would be void as having been procured under the compulsion of an influence that destroyed their operative effect and rendered them null and void as not being the act of the grantor. The question of incapacity was not pressed.

The testimony in this case differs widely from that in the will contest. In this case there is not a debatable question on that issue. There was not one line of testimony from any of the witnesses that either Julia or Kate attempted to exercise or did exercise any undue influence over their mother. For a period of ten months, ending in June, before the deeds were executed on November 30, 1917, Julia was in Denver, and Kate and Genevieve Boeckmann remained at home with the grantor.

Aside from some testimony of family quarrels, and a statement from Julia to Mrs. Boeckmann that she, Julia, would see that Mrs. Boeckmann got nothing from her mother, there was not a word of testimony from which an inference could be drawn that Mrs. Halpin, the grantor, was unduly influenced by the appellants, or either of them, in the execution of said deeds, and in the absence of substantial testimony this phase of the case should not be further considered. [Huffnagle v. Pauley, 219 S. W. 373, l. c. 378; Hern v. Dysart, 220 S. W. l. c. 910, 911; Stanfield v. Hennegar, 259 Mo. 41, l. c. 50, 51.]

V. Respondents offered testimony in an effort to establish a confidential or fiduciary relationship from which, if established, the law would presume undue influence and thus cast the burden of proof upon appellants to overcome such presumption. Again the testimony differs from the testimony adduced in the will contest. In the will contest there was some **Confidential Relation.** testimony that Julia managed the business affairs of Mrs. Halpin, whereas in this case the testimony went no further than to show that Julia aided Mrs. Halpin in the management of her affairs and that this aid consisted in answering the telephone, looking after repairs on her property, and preparing checks for her to sign. This is quite different from a situation where the agent would have in charge the business of the principal and wherein the principal becomes dependent upon the agent. Julia was away from her mother almost one year and until a short time before the execution of the deeds in controversy, and during that time Kate and Genevieve Boeckmann performed the services theretofore attended to by Julia, and furthermore plaintiffs' own testimony showed that the grantor had an agent who looked after her property during the entire time that Julia and Kate were aiding her. The testimony in this case wholly failed to show a confidential relation. [Land v. Adams, 229 S. W. 158; Winn v. Grier, 217 Mo. 420, l. c. 459, 460, 117 S. W. 48; Sanford v. Holland, 276 Mo. 457, l. c. 470, 207 S. W. 818.]

There being no evidence of a confidential relation, the burden of proving undue influence remained on the plaintiffs. [Carl v. Gabel, 120 Mo. 283, 25 S. W. 214; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S. W. 46].

VI.  It appears that plaintiffs relied upon the results achieved in the will contest case as being a controlling evidentiary fact in this case; that is to say, having established by the verdict of the jury in the will contest that Mrs. Halpin was unduly influenced in the execution of the will, dated January 22, 1914, that that status, as a presumption of law, would continue and remain predominant in the execution of the deeds in controversy on November 30, 1917.  It is the law that a physical or mental condition once shown to exist will presumably continue, and a burden is cast on whoever denies such a status to overthrow the presumption. [Nelson v. Jones, 245 Mo. 579; Powell v. Travelers' Protective Assn., 140 S. W. 939, 160 Mo. App. 571; Fairbanks-Morse & Co. v. Coulson Stock Food Co., 151 Mo. App. 260, 131 S. W. 894.]

*Verdict of Jury in Will Contest.*

This presumption, however, is a rebuttable one, and may be overthrown by proof.  It is such a presumption as falls within the characterization made by the courts to the effect that "presumptions are bats of the law, flitting in the twilight, but disappearing in the sunlight of actual facts." [Mockowik v. Railroad, 196 Mo. 550; Tebeau v. Ridge, 261 Mo. 547, l. c. 557; Schaub v. Railroad, 133 Mo. App. 444.]  This is such a presumption only as will sustain the burden of evidence until conflicting facts on the point appear, and in such case the presumption becomes *functus officio* and drops out of sight.  [22 C. J. 124; State ex rel. v. Ellison, 268 Mo. 239, 187 S. W. 23; Brannock v. Jaynes, 197 Mo. App. 150, 193 S. W. 51; Glassman v. Harry, 182 Mo. App. 304, 170 S. W. 403.]

In such cases it ceases to be a debatable proposition and is, therefore, not a matter either for the considera-

tion of the court or jury. Even if we concede that upon the results in the will contest case a status of undue influence evidentiary here was established as of January 22, 1914, and that such status presumably continued, then in the absence of any other proof we must look alone to the testimony of the appellants to ascertain whether or not they put to flight by their evidence the presumption operating against them. Their testimony was overwhelming and conclusive as against that presumption, for it appeared that Mrs. Halpin executed said deeds of her own will, and that there was no interference by the appellants or anybody else; that she thoroughly understood what she was doing, and only did it after consultation with her lawyer who prepared the deeds. Moreover, the trial court erred in admitting the record of the will contest in evidence. That contest was not a proceeding *inter partes,* but a proceeding *in rem,* and the verdict therein is therefore no evidence in this case as to the deeds having been procured by the undue influence of the appellants. [Byrne v. Byrne, 233 S. W. 461, l. c. 464.]

There was no testimony that appellants had anything to do with the transaction, save alone the testimony of Mrs. Canty that Julia told her mother she had some insurance papers for her to sign and handed such papers to her mother as she signed them. It was admitted by the petition that the deeds were acknowledged, and this admission in connection with the testimony of Mr. and Mrs. Dempsey puts to flight any inference that might be drawn from the suggestion of Mrs. Canty that her mother did not know what she was signing.

VII. Appellants complain of the admission of improper testimony by the lower court. An error of that kind would constitute no grounds for reversing the judgment, for the reason that suits in equity are triable anew

Improper
Evidence.

on appeal and the appellate court can exclude from its consideration any inadmissible evidence appearing in the record (Thompson v. Pinnell, 141 S. W. 605; Lacks v. Butler County Bank,

204 Mo. 455, l. c. 479, 102 S. W. 1007), and in view of our decision in this case, it will be unnecessary to consider other questions raised by appellants in their assignments of error.

VIII.   As stated, this is an equity case, and it becomes the duty of this court to review the entire evidence and to determine the results according to the facts. [Brightwell v. McAfee, 249 Mo. 562, l. c. 582.]   We defer somewhat to the findings of the lower court as to the facts and will not disturb such findings, un-

**No Evidence.**   less we are clearly satisfied that they are against the weight of the evidence (McFarland v. Bishop, 282 Mo. 534), but in this case we must hold that the findings of the chancellor below are not only against the weight of the evidence, but are not supported by any evidence at all; and, therefore, the case must be reversed and remanded with directions to dismiss plaintiffs' bill.

It is so ordered.   *Railey* and *White, CC.*, concur.

PER CURIAM:—The foregoing opinion by REEVES, C., is adopted as the opinion of the court.   All of the judges concur.